THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LYNN LOVELACE, Defendant-Appellant.

Second District   No. 2—91—1403

Opinion filed October 26, 1993.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Lynn Lovelace, was charged by indictment with three counts of aggravated battery. Subsequently, defendant was also charged, by information, with two counts of resisting a peace officer.

One of the aggravated battery counts charged that defendant, in committing a battery, without legal justification, knowingly caused great bodily harm to the victim in violation of section 12—4(a) of the aggravated battery statute. (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(a) (now codified, as amended, at 720 ILCS 5/12—4(a) (West 1992)).) The other two aggravated battery counts each charged that defendant, in committing a battery, knowingly, without legal justification, caused bodily harm to a peace officer engaged in the execution of his official duties in violation of section 12—4(b)(6) of the aggravated battery statute. Ill. Rev. Stat. 1991, ch. 38, par. 12—4(b)(6) (now codified, as amended, at 720 ILCS 5/12—4(b)(6) (West 1992)).

After a jury trial in the circuit court of Lake County, defendant was found guilty of one count of aggravated battery to a peace officer and one count of resisting a peace officer. The trial court imposed an 18-month term of conditional discharge, 75 hours of public service, and $900 in restitution.

Defendant appeals and contends that: (1) he was not proven guilty beyond a reasonable doubt; (2) the trial court erred when it refused to allow the jury to hear evidence concerning the complainant's employment evaluation; (3) the trial court erred when it allowed the State to impeach a defense witness with pending charges; (4) the trial court erred when it improperly instructed the jury; and (5) the prosecutor made improper comments during closing argument which denied defendant a fair trial.

The following evidence was adduced at trial. On July 22, 1991, a melee involving hundreds of youths occurred in Zion, Illinois, near a dance center for teenagers called Neon City. The melee began after Neon City closed at midnight, an hour before its 500 to 600 patrons expected it to close.

Only seven Zion police department (ZPD) police officers were on duty that night. Two Lake County deputy sheriffs, who were on duty during the midnight shift patrolling an area including unincorporated Zion, were dispatched to assist the ZPD in controlling the melee. The two deputy sheriffs, Deputy Lawrence Oliver and Deputy Roger Barrette, were driving marked squad cars and wearing official Lake County sheriff's department (LCSD) uniforms which included blue shirts, badges, and patches identifying them as Lake County sheriff's police.

After parking their squad cars near Neon City, officers Oliver and Barrette worked together and went with some ZPD officers to the parking lot next to Neon City. There were several hundred people in the parking lot. Officer Oliver, a 12-year veteran of the LCSD, described the scene as one of "absolute mayhem" with numerous fights occurring and people throwing rocks and bottles. Some individuals in the crowd were chanting "Kill the police. Kill the police." The police officers told individuals to get in their vehicles and leave.

After working to clear the Neon City parking lot, Officers Oliver and Barrette walked to a bank parking lot south of the Neon City parking lot. There, Officer Barrette encountered defendant and the encounter resulted in defendant's arrest and injuries to Officer Barrette. Officer Barrette suffered a broken collar bone and a contusion to the left side of his head. A number of witnesses testified for both sides as to the encounter between Officer Barrette and defendant.

Officer Oliver testified as follows. As Oliver and Barrette walked toward the bank parking lot, they observed a confrontation between several ZPD officers and a group of subjects in the bank parking lot. Defendant, a member of the group confronting the ZPD officers, was engaged in an argument with the police and was yelling at the police.

Officer Oliver's testimony continued as follows. The Zion police instructed defendant to either get in a nearby car and leave, or if defendant could not get in the car, to walk away from the area. Defendant responded "F--- you. I don't have to leave." Zion police again told defendant to leave. Defendant again refused. At that point Officer Barrette advised defendant he was under arrest. Defendant responded "For what? F--- you. I ain't going anywhere." Officer Barrette again advised defendant he was under arrest and that he should

put his hands on the car. A crowd gathered and began yelling and defendant, who had been leaning against the car, started to turn away from Barrette. Barrette began to reach out to take hold of defendant and Barrette eventually got his arms around defendant, partially pinning defendant's arms to his sides. Barrette and defendant were face-to-face. The other police were several feet away from defendant and Barrette. None of the other police officers at the scene were touching either defendant or Barrette. At that point, defendant turned and slammed Barrette to the ground yelling "I'll kill you, motherf-----, I'll kill you." With Barrette on the ground and defendant on top of Barrette, Oliver and one of the Zion police officers tried unsuccessfully to pull defendant up. Another officer then sprayed defendant with Cap Stun, a defensive aid similar to mace, and defendant became noncombative. Oliver and one of the Zion police then were able to pull defendant from Barrette and secured defendant in handcuffs. The police carried Barrette, who was momentarily unconscious, to a nearby ambulance. Oliver transported defendant to a hospital for treatment for the substance sprayed in defendant's eyes and for a bump on defendant's head. Oliver then transported defendant to the sheriff's department for booking. During the booking procedure, defendant stated he was 6 feet tall and weighed about 200 pounds. On cross-examination, Oliver testified that he did not hear anybody say anything about car keys.

Officer Barrette testified as follows. Upon observing the Zion police confrontation with defendant, Barrette intervened in an attempt to calmly settle things down. Barrette told defendant the police were telling him to leave, so he should leave. Defendant responded "F---you man. We don't have to do anything." Barrette told defendant he had to leave and if he did so he would not be arrested. Defendant responded "We can't f---ing go anywhere because the car is locked." After Barrette again told defendant he must leave, a female, Frances Perez, stepped up and unlocked the passenger door of the car. Barrette told defendant he could now get in the car and defendant began to move toward the open car door but stopped and said "F--- you. We don't have to do anything you guys tell us." The female who had unlocked the car door told defendant to just leave, and Barrette again told defendant to leave. Defendant again stated he did not have to leave. Barrette then told defendant "If you do not leave, you will be placed under arrest."

Barrette further testified:

"Then I look at Deputy Oliver. I says, 'If he doesn't go, I'm going to take him.' Then I said to [defendant], 'I will tell you

again to leave or be arrested.' He again says, 'F--- you. I ain't going nowhere.' I said, 'You got to the count of three to leave or you will be arrested.'

I then started counting to three. He continued his yelling. I said, 'Okay, you're under arrest.' I then grabbed his left arm. At that time, he pulled his left arm up; and I let go of the grip then. I then reached up, grabbed around his neck, and brought him down into a head lock so he was bent over. When I did that, I then felt his arms come around the side of me and lift me up, and that was the last thing I remember."

Corporal Gary Dayton, one of the Zion police officers in the bank parking lot, testified as follows. The small group around the car, including defendant, at first told police they were waiting for car keys. After a female opened the car, defendant moved toward the open door, but turned around and came back to the rear of the car and stated words to the effect he did not have to leave. Officer Barrette told defendant he was under arrest and moved toward defendant to turn defendant around and have defendant put his hands on the car. Defendant then "grabbed Officer Barrette around the chest in a bear hug, picked him up, and slammed him to the ground." After two other police officers unsuccessfully attempted to pull defendant off Barrette, Dayton sprayed defendant with Cap Stun and defendant immediately released his hold. When defendant slammed Barrette to the ground, none of the other officers at the scene were touching either defendant or Barrette.

Zion police officer Terry Richards testified as follows. In the bank parking lot, Richards, along with Corporal Dayton and Officers Oliver and Barrette, advised a group of people standing around a car that the group would have to leave. At some point someone said that the group was waiting for car keys. When it was discovered that one of the females in the group had car keys, the police again told the members of the group to leave. Defendant started to get into the car, but then said he was not going to leave. Barrette told defendant he was going to be arrested. Barrette reached out to arrest defendant, and defendant put a "bear hug" on Barrette and "body slammed" Barrette to the ground. At that time, none of the other officers at the scene were touching either defendant or Barrette. Richards made an unsuccessful attempt to pull defendant off Barrette. At that point, Officer Dayton sprayed defendant in the face with Cap Stun and the officers were able to handcuff defendant. None of the officers struck defendant.

Defendant called Al Rogers, a truant officer and assistant dean of students for Waukegan public schools, who testified as follows. Rogers was in the vicinity of Neon City on the night in question, because he was concerned there would be a problem with teenagers there. After observing the disturbance in the Neon City parking lot, Rogers moved to the bank parking lot. Rogers saw five policemen, two in blue shirts and three Zion police, approach a group of three people including defendant and two females. The group was standing near a car.

Rogers further testified as follows. One of the police with a blue shirt told the people standing around the car to get in the car. Defendant responded that he could not get in the car because it was locked. The same officer told defendant to get in the car and leave. Defendant again said he could not get in the car because it was locked. One of the females explained to the blue-shirted officer that the car was locked and they were waiting for the owner to bring the keys. After the police officer repeated his order to get in the car several more times, the officer said to defendant "I told you to get in the f---ing car." Defendant responded, "I told you I can't get in the f---ing car." The officer then lunged at defendant and said defendant was under arrest. The officer lunged with his flashlight and placed the flashlight under defendant's throat and pushed defendant back to the car. The other officers then came to the aid of the first officer who was still standing. All the officers struggled with defendant and wrestled defendant to the ground. All the officers and defendant went to the ground together.

Rogers further testified as follows. At the point that the group of officers wrestled defendant to the ground, a crowd started to form. Rogers turned to the crowd and urged it not to get involved and make matters worse. Rogers succeeded in backing the crowd away. When Rogers turned back to the officers and defendant, he saw defendant being led away. The officer who had lunged at defendant was hurt, and Rogers picked the flashlight up and gave it to another officer. Rogers was familiar with defendant because Rogers had coached defendant in football. Rogers knew from discussions with others that defendant had a reputation for being a peaceful and law-abiding person.

Defendant testified as follows. At the time of the Neon City incident, defendant was 17 years old and a senior at Waukegan high school. Defendant had been working at a fast-food restaurant for about six months. On the night in question, defendant went to Neon City after getting off work at 10:30 p.m. and had arranged to get a ride home with a friend, Frances Perez. After Neon City closed,

defendant found Perez and walked with her to the car in which he was to get a ride home. Two other females were already at the car waiting for the person who had the keys to arrive. At that point, five police officers and two security guards from Neon City came up to the car.

Defendant continued his testimony as follows. A Zion police officer told the group waiting by the car that they had to leave. The group told the officer they could not leave because they did not have the keys. The officer then told the group to get in the car or walk home. The group responded that they could not get in the car and that they lived in Waukegan (presumably too far to walk). Other police then began telling the group to get in the car, and the group responded that the car was locked. This went on for two to three minutes.

Defendant further testified as follows. One of the police officers, Officer Barrette, focused his attention on defendant, who attempted unsuccessfully to get in the car and told Officer Barrette that the doors were still locked. Shortly after that, Officer Barrette told defendant "I will give you three seconds to get into the f---ing car, or you'll be under arrest." Defendant tried the car door and Barrette said to defendant "Get in the f---ing car." Defendant replied, "We can't get in the f---ing car." At that point, Officer Barrette came at defendant as if Officer Barrette was trying to wring defendant's neck. Officer Barrette grabbed defendant by the head and put defendant in a headlock. Defendant broke the headlock, and Officer Barrette put a bear hug on defendant and defendant tried to get loose. At that point, other police piled on and they all ended up on the ground with defendant on top of Officer Barrette. Defendant was reluctant to get up because he was afraid of what the other officers might do to him, so defendant stayed on top of Officer Barrette and only let go when defendant was sprayed in the face. Defendant did not know how he got the lump on his head visible in a photograph taken of him at the police station that night.

On cross-examination, defendant reiterated that he and all the officers were struggling and fell to the ground together and all the officers were holding on to defendant when they hit the ground. However, after hitting the ground, defendant was alone on top of Officer Barrette. Defendant admitted he used a wrestling move, called a swim technique, to break out of Officer Barrette's bear hug.

After defendant's testimony, the defense rested. Over defendant's objection, the State then called Zion police officer Duane Arrington as a rebuttal witness.

Officer Arrington testified as follows. He was present at the confrontation between the police and defendant in the bank parking lot. Upon being told by the police to leave, defendant said the group was waiting for the car's driver and the car keys so they could leave. One of the females in the group, Frances Perez, had car keys in her hand and opened the driver's side door and got into the car. The female did not say anything to defendant. Defendant turned around, started to move to the passenger side door of the car, reached for the door handle, then turned back and said "F--- this. I ain't going anywhere." Officer Barrette then told defendant he was under arrest and reached for defendant's arm. Defendant then grabbed Officer Barrette by the upper arms, threw Officer Barrette down on the ground and lay on top of Officer Barrette. Neither Arrington nor any of the other officers made physical contact with defendant prior to defendant throwing Officer Barrette to the ground. Only defendant and Officer Barrette were on the ground. Eventually, one of the police officers had to spray defendant with Cap Stun to get defendant off of Officer Barrette. None of the officers struck defendant with any objects. Upon seeing that Officer Barrette needed assistance, Arrington started to move to assist Officer Barrette, but Frances Perez, who had gotten out of the car, and another person pushed and shoved Arrington to prevent him from assisting Officer Barrette. Arrington subsequently arrested Frances Perez.

The defense called Frances Perez in surrebuttal. Perez testified as follows. On the night of July 21, 1991, she drove her car with friends to Neon City. She gave her car keys to a friend, Michelle, to hold because Michelle had a purse and Perez did not. When Neon City closed, Perez walked back to her car and joined defendant and two female friends who were sitting on the hood of the car. Perez and defendant were standing by the car waiting for Michelle to bring the car keys when Officer Barrette told them to get in the car. Perez and defendant responded that they could not get in the car because they did not have the keys. Officer Barrette kept telling them to get in the car. There were five officers around defendant. Perez did not open the car. After Officer Barrette told defendant he would be arrested on a count of three, Officer Barrette lunged at defendant. Perez then left the scene.

On cross-examination, Perez acknowledged that the police had arrested her that evening for mob action and obstructing a police officer and that this charge was still pending against her. Perez stated she was arrested for allegedly shoving and scratching a police officer near the car. Perez denied the allegations and admitted that her arrest

made her angry at the police. She stated that defendant is a friend of hers, but denied she would lie for him. She admitted that she did not see any of the actual struggle between defendant and Officer Barrette.

The first issue defendant raises on appeal is whether the State proved defendant guilty of aggravated battery beyond a reasonable doubt. Defendant contends that there are inconsistencies and contradictions in the testimony of the State's witnesses regarding the encounter between Officer Barrette and defendant. Defendant argues that these inconsistencies and contradictions are sufficient to raise a reasonable doubt of defendant's guilt in the face of defendant's testimony and the "entirely reasonable" testimony of defendant's witnesses.

The State responds that the inconsistencies in the testimony of its witnesses are minor and therefore do not justify overturning the jury's guilty verdict. The State argues that all of its witnesses testified that defendant caused Officer Barrette to go to the ground resulting in injuries to Officer Barrette and that none of the other officers had touched defendant at that point. The State maintains that this evidence was sufficient to prove defendant guilty of aggravated battery beyond a reasonable doubt.

Our supreme court recently set out the standards for review of questions regarding the sufficiency of the evidence. The court stated:

"It is the jury's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt. (*People v. Eyler* (1989), 133 Ill. 2d 173, 191.) '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *People v. Collins* (1985), 106 Ill. 2d 237, 261.) In addition, it is for the jury to weigh the credibility of the witnesses and to resolve conflicts or inconsistencies in their testimony. (*People v. Phillips* (1989), 127 Ill. 2d 499, 514.)" *People v. Frieberg* (1992), 147 Ill. 2d 326, 359-60.

■ To sustain a charge of aggravated battery of a police officer, the State was required to prove that defendant committed a battery with knowledge that the individual harmed was a police officer engaged in the execution of his official duties, including an attempted arrest. (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(b)(6) (now codified, as

amended, at 720 ILCS 5/12—4(b)(6) (West 1992)).) Defendant's own testimony established that he knew that Officer Barrette was a police officer who was attempting to arrest him. Thus, the only question before us in determining whether the State proved its charge of aggravated battery was whether defendant committed a battery on Officer Barrette while Officer Barrette was attempting to arrest defendant.

The testimony of the State's witnesses, when viewed in the light most favorable to the State, was sufficient to prove defendant guilty beyond a reasonable doubt. Despite the inconsistencies in that testimony, a rational trier of fact could have found that defendant caused Officer Barrette to go to the ground by committing a battery on Officer Barrette. The inconsistencies in the testimony were not serious enough to create reasonable doubts about the testimony. See *People v. Parsons* (1991), 222 Ill. App. 3d 823, 831.

The conflicting testimony of defendant and defendant's witnesses does not change our conclusion. Defendant and Rogers testified that Officer Barrette lunged at defendant and then all the police officers piled on and together wrestled defendant to the ground. The jury heard this conflicting testimony. It was within the province of the jury, as the trier of fact charged with resolving conflicts in testimony, to reject this testimony. We will not disturb the jury's finding of guilt where, as here, the evidence is not so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt.

The next issue we will address is whether the trial court erred by improperly instructing the jury when it failed to provide the jury with both paragraphs of a pattern jury instruction defining the "knowingly" element of the aggravated battery charges. After arguments at the instructions conference, over defendant's objection, the trial court gave the jury an instruction derived from the first paragraph, but not the second paragraph, of Illinois Pattern Jury Instructions, Criminal, No. 5.01B (2d ed. Supp. 1989) (hereinafter IPI Criminal). The instruction stated:

> "A person acts knowingly with regard to the nature or attendant circumstances ofhis [*sic*] conduct when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such facts exist."

Defendant argued that the court should have given the jury an additional instruction defining "knowingly," derived from the second paragraph of IPI Criminal 2d No. 5.01B (Supp. 1989). That instruction would have stated:

"A person acts knowingly with regard to the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct."

After the jury began its deliberations, it sent a note to the court which stated: "we need an interpretation of 'knowingly or intentionally caused bodily harm.' " The trial court heard arguments by counsel for both sides. Defendant contended that the jury's confusion indicated that the jury had been improperly instructed as to the "knowingly" element. Defendant argued that the court should try to salvage the situation by giving the second paragraph of IPI Criminal 2d No. 5.01B (Supp. 1989). The State contended that the jury had been properly instructed and argued that the court should respond by telling the jury to continue deliberating. The trial court agreed with the State and merely responded to the jury that it had its instructions and should follow them.

On appeal, defendant contends that the jury was improperly instructed resulting in reversible error. Defendant argues that the court erred in the first place because the committee comments to IPI Criminal 2d No. 5.01B (Supp. 1989) require the use of both paragraphs when both conduct and result are in issue and both were in issue here. Defendant also cites *People v. Brouder* (1988), 168 Ill. App. 3d 938, for the proposition that it is reversible error to fail to instruct a jury on the definition of "knowingly" when the jury specifically requested such an instruction.

The State replies that the term "knowingly" has an ordinary meaning within the common knowledge of the jury and therefore it is not necessary to instruct the jury on the meaning of the term. The State also contends that the trial court properly and fully instructed the jury by only giving the first paragraph of the pattern instruction because the jury had also been instructed as to the elements of the aggravated battery charges and the definition of "knowledge." The State argues that giving the jury the second paragraph would only have confused the jury because it then might have erroneously believed it had to find that defendant knew what injuries he would cause. Finally, the State argues that *Brouder* is factually distinguishable from this case and that the controlling case should be *People v. Waldron* (1991), 219 Ill. App. 3d 1017, which held that it was not *per se* necessary to reinstruct a jury, upon the jury's request, as to the definition of "intent."

■ We conclude that the trial court erred in not giving the jury both paragraphs of IPI Criminal 2d No. 5.01B (Supp. 1989). We agree with defendant that the committee comments indicate that both para-

graphs are required when conduct and result are in issue. (IPI Criminal 2d No. 5.01B, Committee Note, at 75 (Supp. 1989).) We find that both conduct and result were in issue here because the indictment charged defendant with both aggravated battery by knowingly causing great bodily harm and aggravated battery of a peace officer with the underlying battery based on knowingly causing bodily harm. Thus, to prove its case, the State was required to show that defendant knowingly caused great bodily harm or knowingly caused bodily harm to a peace officer. (Ill. Rev. Stat. 1991, ch. 38, pars. 12—4(a), (b)(6) (now codified, as amended, at 720 ILCS 5/12—4(a), (b)(6) (West 1992)).) Under the battery and aggravated battery statutes, a defendant charged with knowingly causing great bodily harm or bodily harm must be consciously aware that his conduct is practically certain to cause great bodily harm or bodily harm, *i.e.*, the result of his conduct is in issue. (See *People v. Psichalinos* (1992), 229 Ill. App. 3d 1058, 1067.) Accordingly, the trial court should have given both paragraphs of IPI Criminal 2d No. 5.01(B) (Supp. 1989).

The State's contention that it was not necessary to instruct the jury on the meaning of "knowingly" is unpersuasive. We recognize that there is authority for the proposition that because the term "knowingly" has a plain meaning within the jury's common knowledge, it is not necessary to instruct a jury as to the meaning of that term. (*E.g., People v. Powell* (1987), 159 Ill. App. 3d 1005, 1013.) However, a circuit court has a duty to instruct a jury where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused. *People v. Reid* (1990), 136 Ill. 2d 27, 39.

Here, as seen above, the original instructions were incomplete because the circuit court erred when it did not give the jury the second paragraph of the instruction defining "knowingly." After receiving the incomplete instruction, the jury indicated that it was confused by requesting clarification of terms, including "knowingly." Under these circumstances, where the court determined that it should instruct the jury as to the meaning of "knowingly" but gave the jury an incomplete instruction, the State's argument that the court was not required to instruct the jury as to the meaning of "knowingly" is unavailing. Once the court determined that it should instruct the jury on the matter and gave the jury instructions on the matter, the court was required to give complete instructions on the matter. See *Reid*, 136 Ill. 2d at 39.

*Waldron* is distinguishable from this case. The primary distinction is that there the jury requested clarification on an instruction which

was sufficient to explain the relevant law. Here, the given instruction was incomplete and did not explain the relevant law.

The State's contention that the complete instruction would have confused the jurors because they might have erroneously been led to believe that they had to find that defendant knew what injuries he would cause is also unavailing. Battery by knowingly causing bodily harm (the underlying battery of the aggravated battery to a peace officer charge at issue here) does not require a showing that defendant knew exactly what injuries he would cause; rather, it only requires showing that defendant knew some sort of physical pain or damage to the body would be caused. (See *People v. Mays* (1982), 91 Ill. 2d 251, 256.) Whether a person acted knowingly with respect to bodily harm resulting from one's act is, due to its very nature, often proven by circumstantial evidence, rather than by direct proof. (*People v. Renteria* (1992), 232 Ill. App. 3d 409, 417.) In view of these principles, an instruction defining "knowingly" in terms of the results of a person's conduct would not have required the jury to find that defendant knew what injuries he would cause. Thus, an instruction based on the second paragraph of IPI Criminal 2d No. 5.01B (Supp. 1989) would not necessarily have confused the jury in that regard.

Having concluded that the trial court erred when it failed properly to instruct the jury as to the meaning of "knowingly," we are left with the question of whether the error was harmless. An error in a jury instruction is harmless if the result of the trial would not have been different if a proper instruction had been given. *People v. Markiewicz* (1993), 246 Ill. App. 3d 31, 44.

We cannot say that the error was harmless. If the jury had been properly instructed, the jury might not have concluded that defendant knowingly caused bodily harm to Officer Barrette. When the jury requested "an interpretation of knowingly or intentionally caused bodily harm," it also asked "is (caused) during or after the fact?" This shows that the jury was confused about the point of law that the additional instruction would have addressed, *i.e.*, whether "knowingly" applied to defendant's conduct or the result of defendant's conduct. Given the conflicting accounts of the encounter between Officer Barrette and defendant, the jury, if it had been properly instructed, might have concluded that the circumstantial evidence did not support a finding that defendant "knowingly" caused bodily harm to Officer Barrette. Under the improper instruction, the jury could have concluded that defendant acted knowingly as to his conduct, but not as to the result of his conduct, and still found defendant guilty. This would have been an erroneous conclusion.

For all these reasons, we find that the trial court's error in instructing the jury on the meaning of "knowingly" requires the reversal of the trial court's judgment and that this cause be remanded for a new trial.

Although the foregoing is dispositive of this case, we will address some of the remaining issues because they may recur on retrial. The next issue is whether the trial court erred when it denied defendant's motion *in limine* seeking to question Officer Barrette about his reputation within the LCSD for being able to deal with the public in stressful situations. Defendant had three of Officer Barrette's employment evaluations indicating that Officer Barrette needed improvement in "communicating with the public" and "controlling his emotions in stressful situations." Defendant intended to impeach Officer Barrette with the employment evaluations if Officer Barrette did not testify on cross-examination that he had a negative reputation for dealing with stress.

On appeal, defendant contends that the trial court erred by excluding the evidence of Officer Barrette's reputation because it was highly relevant and went to the "core issue" of who was the aggressor in the encounter between Officer Barrette and defendant. Defendant relies on cases holding that evidence of a homicide or aggravated battery victim's violent character is admissible. Defendant also hypothesizes that the jury might have concluded from the reputation evidence that Officer Barrette overreacted and the other officers came to his aid, or tended to corroborate Officer Barrette's testimony to protect Officer Barrette from "further disciplinary action."

The State concedes that evidence of a victim's propensity for violence is admissible when a question of self-defense is raised. However, the State contends that other traits of the victim are not admissible. The State argues that the trial court properly excluded the evidence in question here because it did not show a propensity for violence. The State also argues that defendant here did not defend on the basis of self-defense.

It is well settled in Illinois that when a defendant raises a theory of self-defense, evidence of the victim's aggressive and violent character is relevant and admissible to show who was the aggressor. (*People v. Lynch* (1984), 104 Ill. 2d 194, 200.) However, the evidence of the victim's character must be relevant, and a court should exclude evidence that does not make the proposition that the victim was the aggressor more probable. (*People v. Huddleston* (1988), 176 Ill. App. 3d 18, 29.) We will not disturb a trial court's decision on the admissibility

of such evidence absent a clear abuse of discretion resulting in manifest prejudice. *People v. Davis* (1990), 193 Ill. App. 3d 1001, 1005.

■ We find that the trial court did not abuse its discretion in excluding the evidence in question here. Defendant's reliance on *People v. Robinson* (1977), 56 Ill. App. 3d 832, for the proposition that evidence of a victim's violent character is admissible in cases where a defendant does not raise the issue of self-defense is unpersuasive because it does not change the requirement that the evidence must tend to show that the subject had a violent character. The evidence defendant proffered here simply did not tend to make the proposition that Officer Barrette was the aggressor more probable. Defendant did not show how employment evaluations indicating that Officer Barrette needed to improve in the areas of communicating with the public and controlling his emotions in stressful situations indicated that Officer Barrette had a violent character. If evidence does not tend to show that a victim has a violent character, it does not have probative value in determining who was the aggressor in an altercation. (*People v. Fischer* (1981), 100 Ill. App. 3d 195, 199.) Accordingly, we hold that the trial court did not abuse its discretion when it excluded the evidence in question here.

The final issue we will address is whether improper comments by the prosecutor in his closing argument denied defendant a fair trial. Defendant contends that there were two instances of improper comments: (1) misstatement of the evidence with respect to the testimony of Al Rogers; and (2) inflaming the jury's passions by implying that a not guilty verdict would amount to not supporting law enforcement officers.

■ After carefully reviewing the record, we conclude that the prosecutor did misstate the evidence with regard to Rogers' testimony. The misstatement occurred when the prosecutor said in closing remarks that Rogers had appeared before the Zion city council "complaining of police brutality." We caution the State against such misstatements upon retrial.

Defendant also alleges that he was substantially prejudiced by other comments made by the prosecutor during the State's closing argument. Defendant characterizes the comments as improper calls to the jury to protect the police. After an exhortation by the prosecutor to the jury to follow the law rather than give defendant an extra break, when the prosecutor stated "[i]f you are not willing to protect those who protect us," defense counsel interrupted the prosecutor's closing argument and asked to approach the bench. Defense counsel advised the court that the prosecutor had exceeded his time limit.

When the prosecutor resumed his closing argument and began to repeat the same statement, defense counsel objected on the ground of improper argument. The trial court simply told the prosecutor "Finish." The prosecutor then stated "if you are not willing to give justice to those who administer justice to us when they deserve it, then the next time that you hear someone talk about the society we live in, how terrible things have gotten, ask for not [*sic*] whom the bell tolls. It tolls for thee." Defendant then objected and requested that the entire last part of the prosecutor's comments should be stricken. The trial court overruled defendant's objection.

After the jury retired to deliberate the verdict, defendant motioned for a mistrial based on improper argument which defendant characterized as asking the jury to convict defendant in order to protect the police. The trial court denied defendant's motion. In his post-trial motion, defendant again argued this issue and specifically relied on *People v. Threadgill* (1988), 166 Ill. App. 3d 643. The trial court denied defendant's motion for a new trial.

On appeal, defendant again relies on *Threadgill*. The *Threadgill* court noted that the prosecutor made repeated statements in his closing argument suggesting that the decision of the jurors would show whether the jurors supported the police and would affect what the police felt as far as juror support, and that a not guilty verdict "was tantamount to not supporting law enforcement in the community." (166 Ill. App. 3d at 651.) In *Threadgill*, the prosecutor made at least seven separate statements along those lines including the following: "[i]t is going to be your decision in this case and the decision you are going to make is going to have an effect on how people conduct themselves in your community and what the police feel as far as support from you." (Emphasis omitted.) (166 Ill. App. 3d at 649.) The *Threadgill* court concluded that the prosecutor's remarks exceeded the bounds of propriety because they were calculated to arouse the fears and prejudices of the jurors that if the jurors found defendant not guilty the police would feel that the jurors were turning their backs on the police. The court noted that the prosecutor's remarks "attempted to play upon the personal circumstances and fears of the jurors." 166 Ill. App. 3d at 651.

Here, defendant contends that the prosecutor's closing remarks were similarly calculated to arouse the jurors' passions. Moreover, defendant argues that the error was worse here because, unlike *Threadgill*, defendant here objected during the prosecutor's argument and immediately motioned for a mistrial at the conclusion of defendant's closing argument.

■ We find that the prosecutor's comments here were distinguishable from those in *Threadgill*. In *Threadgill*, the prosecutor made repeated attempts to arouse the jury's passions in a personalized way. The *Threadgill* court concluded that the prosecutor's statements served no purpose except to inflame the jury. Here, the prosecutor made one comment which was in the nature of a call to duty. It is not improper for the prosecutor to comment on the evil results of crime and to urge the jury to fearlessly follow the law. (*People v. Harris* (1989), 129 Ill. 2d 123, 159-60.) Just prior to the statement in question, the prosecutor had urged the jury not to give defendant a break simply because he did not seem like a "bad guy." The prosecutor had also urged the jury to follow the law and if the law proved defendant guilty, then not let sympathy for the defendant interfere with a guilty verdict. In this context, the prosecutor's statement does not have the personalized threatening character of the repeated statements in *Threadgill*. For these reasons we cannot say that the prosecutor's statement was calculated to inflame the jury. Accordingly, the statement in question here was not improper in view of the broad latitude given to a prosecutor in presenting his or her closing argument. See *People v. Peeples* (1993), 155 Ill. 2d 422, 482.

Because we are remanding for a retrial, we will not address the remaining issue. We note that we do not intend our finding that the evidence was sufficient to support a conclusion that defendant was guilty beyond a reasonable doubt to be in any way binding, upon retrial, as to defendant's guilt or innocence. We only intend to protect defendant from the risk of double jeopardy. *People v. Taylor* (1979), 76 Ill. 2d 289, 309.

Based on the foregoing, the judgment of the circuit court of Lake County is reversed, and the cause is remanded.

Reversed and remanded.

GEIGER and QUETSCH, JJ., concur.