THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES LANDWER, Defendant-Appellant.

Second District   No. 2—92—0232

Supplemental opinion filed April 17, 1996.

DOYLE, J., dissenting.

G. Joseph Weller, Ingrid L. Moller, and Paul J. Glaser (argued), all of State Appellate Defender's Office, of Elgin, for appellant.

Anthony M. Peccarelli, State's Attorney, of Wheaton (William L. Browers and Mary Beth Burns (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

## SUPPLEMENTAL OPINION

PRESIDING JUSTICE McLAREN delivered the opinion of the court:

The defendant, Charles Landwer, was charged with two counts of solicitation to commit murder for hire. Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2 (now 720 ILCS 5/8—1.2 (West 1992)). At trial, he raised the affirmative defense of entrapment. Ill. Rev. Stat. 1989, ch. 38, par. 7—12 (now 720 ILCS 5/7—12 (West 1992)). On November 8,

1991, a jury found the defendant guilty of both counts. The trial judge sentenced the defendant to two concurrent terms of 20 years in prison. This court reversed the convictions and remanded the cause for a new trial, finding error on two points: (1) the trial court erred by refusing to instruct the jury on the offense of solicitation to commit aggravated battery as a lesser included offense of solicitation to commit murder; and (2) the prosecution made improper remarks during closing argument which materially prejudiced the defendant. *People v. Landwer*, 254 Ill. App. 3d 120 (1993). However, our supreme court reversed this court's decision and remanded the cause for resolution of issues undecided in this court's earlier decision. *People v. Landwer*, 166 Ill. 2d 475 (1995). Accordingly, we address whether: (1) the trial court erred in refusing to answer the jury's question; and (2) the State provided sufficient evidence to find the defendant guilty of solicitation of murder for hire beyond a reasonable doubt.

The defendant, owner of an auto repair and body shop, was convicted of soliciting the murder of two of his employees, Aric Cherim and James Haliotis. The defendant was angry with Haliotis because the defendant believed that Haliotis stole tools from the auto shop and sent threatening letters to the defendant.

The defendant was angry with Cherim because Cherim spoke with a Du Page County State's Attorney investigator about the defendant's questionable "repossession" activities. Cherim's cooperation led to a 36-count indictment against the defendant for various automobile offenses. At trial in the instant case, the defendant testified that he originally wanted to have Cherim and Haliotis injured, but acquiesced to having them murdered after Robert Holguin, a Du Page County State's Attorney investigator, repeatedly prodded him.

After the defendant was arrested in connection with the alleged automobile offenses, he told Chris Bowden, who "repossessed" cars with the defendant, to keep quiet about their business. According to Bowden, on November 16, 1990, the defendant asked Bowden if he "had a problem with [Cherim] being taken out." The defendant also told Bowden that he knew where Cherim's girlfriend worked and would "get" Cherim. In addition, the defendant told Bowden that Martin Luther King "would still be alive today if [Cherim] would have just learned to keep his mouth shut." Bowden called the State's Attorney's office because he was frightened. He told Lori Chassee, a Du Page County State's Attorney investigator, that the defendant planned to kill Cherim. The defendant told Bowden that Cherim "was a dead man, just like anybody else who talked," and the defendant claimed that he had some friends "working on it, and when [Cherim] isn't looking over his shoulder, he is going to hit [Cherim]."

The defendant asked Bowden to befriend Cherim so that the police would not suspect Bowden if Cherim "had an accident."

Bowden agreed to assist the State's Attorney's office in eavesdropping on his phone calls with the defendant. On December 21, Chassee secured an eavesdropping order from a Du Page County judge. The following day, Bowden placed a tape-recorded call to the defendant from the State's Attorney's office. During the conversation, the defendant stated that he knew a man named "Barbecue Jerry" who had "some friends who could help some of our friends have a change of attitude." During another tape-recorded conversation, the defendant told Bowden that "Barbecue Jerry" had "some people who are going to, you know, turn—change people's mind, you know, did you ever steal a cookie when you were small and your mother slapped your hand?"

Subsequently, Investigator Holguin told Bowden to discredit "Barbecue Jerry" and persuade the defendant to use Holguin, who would pose as a more reliable "hit man." On December 28, 1990, Bowden and the defendant discussed Holguin in a taped-recorded conversation:

> "BOWDEN: Well this [new] guy [Holguin] will probably come through, you know? Well what exactly do you want to do? This guy makes people gone, like that's what we're talking, right?
>
> [DEFENDANT]: I thought a severe beating would be sufficient because then if it ever filtered down to us.
>
> BOWDEN: I want to track down [Cherim].
>
> [DEFENDANT]: We'd like to see seven days in the nice hospital.
>
> BOWDEN: In the next seven days?
>
> [DEFENDANT]: No, we'd like to see them spend seven days in the hospital.
>
> ***
>
> You know, a couple of broken legs is fine, something you can't you know [sic].
>
> BOWDEN: Well, I was thinking.
>
> [DEFENDANT]: Uh, you were unless you want to have it gone that would be fine, too.
>
> BOWDEN: Well, that's what I assumed, I mean.
>
> [DEFENDANT]: I would lose no sleep over it, would you?
>
> BOWDEN: No, no.
>
> * * *
>
> [DEFENDANT]: Yeah, call the guy, get the story, and then if he wants like [$500] apiece, yeah, we can do that.
>
> BOWDEN: That's probably what he'll want.
>
> [DEFENDANT]: That's no problem, I mean, he'll get the job done.

BOWDEN: Yeah, I'm like, I'm pretty confident. I wouldn't have told you about it if I didn't think so.

[DEFENDANT]: Gone might be better.

BOWDEN: What's that?

[DEFENDANT]: Gone might be good.

BOWDEN: Well, that's kind of like what this guy does, I mean, that's what I, you know, mean that's my motivation for getting him.

[DEFENDANT]: All I think is that this has got to come to a grinding halt. The stories have to be stopped today."

On January 2, 1991, Bowden told the defendant in another tape-recorded conversation that his "hit man" wanted $600 for each person they wanted taken care of. The defendant reluctantly agreed to meet Holguin, after Bowden told the defendant that the "hit man" would only take the job if he met the defendant personally. Bowden, Holguin, and the defendant met later that day in the parking lot of a fast-food restaurant. During that meeting, in which Holguin was fitted with a recording device, the following conversation ensued:

"HOLGUIN: O.K. Well, I mean, what kind of an end do you want?

[DEFENDANT]: Whatever you feel comfortable, you know, you know. Whatever you think is a ... (inaudible).

HOLGUIN: Well, you know. I'll tell you. You're paying for it man, I mean, you're the one, I mean, this guy's gonna be pissed off cause, you know, you bang him up a little. Is he gonna, is it gonna piss him off more, I mean, what do you want?

[DEFENDANT]: I don't know.

HOLGUIN: What do you want, I mean.

[DEFENDANT]: What do you think, [Bowden]? What do you think? Put an end to this problem once and for all?

BOWDEN: I thought that was your understanding. You know, that's kind of what I led him to believe.

[DEFENDANT]: That's fine.

\* \* \*

HOLGUIN: O.K. The problem is, what do you want done, I mean.

[DEFENDANT]: Well, I mean, what do you think it will take to keep the kid quiet? What do you think, [Bowden], do you just want to get rid of it?

BOWDEN: Well you talked, that's what I assumed you were talking about.

[DEFENDANT]: I think that's best and the least problems.

\* \* \*

HOLGUIN: You know, obviously it's a lot easier to just hit him. I mean, it depends on what you want.

[DEFENDANT]: That's probably the best just ...

HOLGUIN: [T]hey find him, *** he got somebody pissed, you know, he got in a fight somewhere, boom, somebody just, you know, just blew him away or something.

\* \* \*

HOLGUIN: So you want him dead?

[DEFENDANT]: If the story stops, we'll know quick enough if the stories stop, you know what I'm saying.

\* \* \*

HOLGUIN: O.K. So what do you want done with this guy, obviously, do you want a broken leg, I mean do you want me to shoot him, or what? Once in the head, what? I don't want no misunderstandings, guy, O.K.? Cause I don't want you to come back later at me, well, not, I just, you know, wanted this guy hurt. I mean, tell me exactly what you want.

[DEFENDANT]: Do you think it's gonna solve our problems, [Bowden]? Yes or no?

BOWDEN: A hurt body still has lips.

[DEFENDANT]: Yeah, see, I think that will just piss him off more. What do you think?

HOLGUIN: Well, my experience is yeah, you know, then he's gonna really be pissed off at you, but it's up to you.

[DEFENDANT]: I mean, the kid goes ... four-wheeling, the kid goes some places, you follow the kid around for a half, a couple hours, I mean, you know.

HOLGUIN: Well, O.K. That's fine. I mean, but what do you need done? What do you exactly want done to him?

[DEFENDANT]: Shut the kid up somehow, shut him up and be done with it. I don't care whatever it takes, he keeps telling story after story.

HOLGUIN: Do you never want him to talk again?

BOWDEN: Why is this so weird? I mean, isn't this what we talked about on the phone, Chuck?

[DEFENDANT]: Yeah, just do that. Finish the kid and be done with it, O.K.? That's the best."

During the same conversation, the defendant and Holguin discussed Haliotis. The defendant agreed to pay Holguin $300 in advance for each job and $300 each after Holguin completed his work. The defendant gave Holguin $300 for the attack on Cherim and then left the parking lot.

The following day, January 4, 1991, Holguin called the defendant, and they agreed to meet again. During the meeting, the defendant gave Holguin Haliotis' description and address. The following conversation was recorded:

"HOLGUIN: So, you all set for this weekend? I mean, I mean, I'm gonna kill these guys, you know? These guys are gonna be dead.

[DEFENDANT]: I'll get the cash, I know."

Holguin signaled the police who arrested the defendant.

Amy Gillette, a friend of Bowden's and the defendant's, testified that the defendant told her that Cherim was "going to have a real bad accident," but he never said that he wanted anyone killed. Gillette also testified that late in November 1990 Bowden told her that "he was going to get everything out of [the defendant] before [the defendant] was put away" and that "information was the best thing to have against someone."

Jerry Raymond, "Barbecue Jerry," testified that, in November or December 1990, he asked the defendant for a loan and the defendant asked him if he knew "anybody that can rough up a couple of punks." Raymond said that he did, but the defendant never asked Raymond to act on the inquiry.

To support his entrapment defense, the defendant testified that Bowden originated the idea of killing Cherim and first mentioned the idea in their taped phone conversation of December 28, 1990. The defendant stated that, at the time, he thought the proposed plan was extreme and unnecessary. The defendant stated that by late December he was not threatened by Cherim any longer because Cherim told the prosecutors all he could about the alleged auto thefts and "there wasn't much dirt left." The defendant denied telling Bowden to find someone to kill Cherim and claimed he met with Holguin only because Bowden repeatedly insisted. The defendant said that Holguin originated the idea of killing Haliotis and that he finally agreed to have Cherim killed midway through the January 8, 1991, meeting with Holguin and Bowden. The defendant said that he did not develop the intention to have both Cherim and Haliotis killed until his meeting with Holguin on January 4, 1991.

The trial judge instructed the jury on the defense of entrapment. The instruction provided:

"It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant he was incited or induced by a public employee and/or an agent of a public employee to commit an offense.

However, the defendant was not entrapped if a public employee and/or agent of a public employee merely afforded the opportunity or facility for committing an offense in furtherance of a criminal purpose which the defendant *originated*." (Emphasis added.)

See Illinois Pattern Jury Instructions, Criminal, No. 24—25.04 (2d ed. 1981) (hereinafter IPI Criminal 2d). The jury began deliberating at 1:20 p.m. on November 8, 1991. At some point later, the jury sent a note to the judge which stated:

"Judge, could you clarify or give us a definition of what the court (law) defines with the word 'originated'. As it pertains to the last sentence of what entrapment means."

Later that day, at 3:55 p.m., the trial judge responded:

"The word 'originated' has a commonly understood and accepted meaning, and needs no further definition."

At 4:25 p.m., the jury sent a second note to the judge which stated:

"Judge, we respectfully request a copy of the *ease drop order* [*sic*]. Exhibit #2. *** P.S. Send in a dictionary."

At 5:05 p.m. the trial judge replied:

"The eavesdrop order or its issuance is not an issue in the case. The testimony you have heard regarding it is all that is necessary for your deliberations.

With respect to your request for a dictionary, is it for the purpose of a definition of the word 'originate'?"

The jury promptly responded:

"Judge, we want the dictionary for the word 'originated.' "

However, at 5:40 p.m., over the defense counsel's objection, the judge refused the jury's request, stating:

"You will not be permitted to have a dictionary during your deliberations.

As indicated earlier, the word 'originated' has a commonly understood and accepted meaning which doesn't require further definition."

At 10:45 p.m. the jury returned a verdict finding the defendant guilty of both counts as charged.

On remand we address the defendant's argument that the trial judge committed reversible error by failing to clarify to the jury the definition of "originated" contained in the entrapment instruction. The State argues that the trial court properly refused to define the term and properly refused to supply the jurors with a dictionary. The State asserts that the defendant acknowledged that the jurors had been properly instructed. The State also claims that the granting of the jury's request would have opened a "Pandora's box" and required an improper colloquy. We disagree with the State.

■ We first note that, while the defendant objected to the trial court's refusal to answer the jury's question, the defendant's counsel acknowledged that the jury had been properly instructed and failed to submit a proposed instruction on the definition of "originated." We recognize that a defendant may not "raise on appeal the failure to

give an instruction unless he shall have tendered it." 134 Ill. 2d R. 366(b)(2)(i); *People v. Fetter*, 227 Ill. App. 3d 1003, 1007 (1992). However, when the trial court's failure to instruct the jury properly precludes it from considering a viable defense, we may consider the error even when the defendant has failed to preserve properly the issue on appeal. *People v. Kittinger*, 261 Ill. App. 3d 1033, 1038 (1994). Further, when a jury is confused about a question of law, the trial court has a duty to provide clarification, even though the jury was initially properly instructed. *People v. Childs*, 159 Ill. 2d 217, 229 (1994); *People v. Oden*, 261 Ill. App. 3d 41, 45-46 (1994).

■ A trial court's decision to answer or refrain from answering a question from the jury will not be disturbed absent an abuse of discretion. *People v. Reid*, 136 Ill. 2d 27, 38-39 (1990); *People v. Kamide*, 254 Ill. App. 3d 67, 72 (1993). It is well established that a trial judge may properly decline to answer a jury's questions when the instructions are legally correct and understandable, further instruction would mislead the jurors, jurors raise questions of fact, or an answer or explanation by the court would likely direct a verdict. *Childs*, 159 Ill. 2d at 228; *Kamide*, 254 Ill. App. 3d at 72. However, the court should attempt to clarify the question when a jury raises: (1) an explicit question; (2) on a point of law arising from the facts; (3) over which there is doubt or confusion. *Childs*, 159 Ill. 2d at 228-29; *Kamide*, 254 Ill. App. 3d at 72.

■ In this case, the jurors raised an explicit question: the definition of one word, "originated." This question is no less explicit than the question asked in *Childs*. In *Childs* the jury asked whether the defendant "could be found guilty of armed robbery and either voluntary or involuntary manslaughter, or if a finding of guilt of armed robbery mandated a 'guilty of murder' verdict." *Childs*, 159 Ill. 2d at 229. Our supreme court held that the jury's question was explicit and manifested confusion regarding a question of law. *Childs*, 159 Ill. 2d at 229. In addition, the question the jurors asked in the instant case is no less explicit than the question asked in *Oden* (261 Ill. App. 3d 41). In *Oden*, the jury asked "What is possession?" during a case in which the defendant was charged with unlawful possession of a weapon. The Appellate Court, Fifth District, held that the trial court committed reversible error when it refused to attempt to clarify the issue. *Oden*, 261 Ill. App. 3d at 47.

Further, like *Childs* and *Oden*, the jury's question in the instant case was one of law. The word "originated" appears in the pattern instruction that was given to the jury (IPI Criminal 2d No. 24—25.04) and in the statute defining the entrapment defense (Ill. Rev. Stat. 1989, ch. 38, par. 7—12 (now 720 ILCS 5/7—12 (West 1992)). This

court previously held that a jury's request for a definition of a word contained in a jury instruction is a question of law. *Kamide*, 254 Ill. App. 3d at 72; *People v. Lovelace*, 251 Ill. App. 3d 607, 619 (1993). For example, in a case in which the defendant was charged with driving under the influence of alcohol, this court determined that the meaning of the word "alcohol" constituted a question of law. *Kamide*, 254 Ill. App. 3d at 72. This court held that the trial court erred when it refused to provide a definition of "alcohol" after the jury indicated its confusion over the term. *Kamide*, 254 Ill. App. 3d at 72.

The dissent acknowledges "that the word 'originated' is a key word in the entrapment instruction." 279 Ill. App. 3d at 318. However, it then disputes whether its meaning is a question of law. The issue is easily reduced to a simple choice: the meaning of the word "originated" is either a question of law or a question of fact. We do not believe that a key word contained in the jury instruction for entrapment and the entrapment provision of the Criminal Code of 1961 is a question of fact. The word at issue in this case and the word at issue in *Lovelace* (251 Ill. App. 3d 607) both address the issue of *mens rea*. "Originated" expresses the timing of the *mens rea* needed to rebut the defense of entrapment (720 ILCS 5/7—12 (West 1992)) and "knowingly" expresses the quality of *mens rea* needed to establish the offense of aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(b)(6) (now 720 ILCS 5/12—4(b)(6) (West 1994))). A question of fact arises when the jury applies the law (the instructions) to the evidence and decides whether the defendant "originated" the intent to solicit murder for hire or, as in *Lovelace*, whether the defendant "knowingly" caused bodily harm. 251 Ill. App. 3d at 619. The fact that the legal definition and the common meaning of "originated" are the same does not transform the question into one of fact. Therefore, we believe that the meaning of the word "originated" is a question of law, in this case.

In addition, the record reveals that the jury was, in fact, confused. Despite the trial court's and dissent's insistence that the word "originated" has a common meaning, the record reveals that the jury did not understand or was not aware of the common meaning. While the meaning of the word "originated" may seem obvious to us, the record clearly indicates that the jurors were, indeed, confused. They asked for a definition three times. The juries in *Childs, Kamide*, and *Lovelace* inquired only once. *Childs*, 159 Ill. 2d at 229; *Kamide*, 254 Ill. App. 3d at 70; *Lovelace*, 251 Ill. App. 3d at 618. Nevertheless, our supreme court and this court held that the juries were confused.

The dissent is unconvinced that the jurors were confused because the word "originated" "has a common meaning understandable to

the average juror." 279 Ill. App. 3d at 318. However, this court previously stated that although a term "has a plain meaning within the jury's common knowledge *** [the trial court] has a duty to instruct a jury where clarification is requested." *Lovelace*, 251 Ill. App. 3d at 619.

The dissent also believes that the trial court properly refused to provide the jurors with a definition of "originated" because the instructions were accurate. However, when a jury is confused about a question of law, the trial court has a duty to provide clarification, even though the jury was initially properly instructed. *Childs*, 159 Ill. 2d at 229; *Oden*, 261 Ill. App. 3d at 46. "[W]hether the instructions were proper *** is not the determinative inquiry. The issue is whether the instructions were clearly understandable to the jury." *Childs*, 159 Ill. 2d at 231. Because the jury demonstrated confusion as to an explicit question of law contained in a jury instruction, we determine that the trial court erred by refusing to provide the jury with an instruction or a dictionary meaning on the word "originated." *Kamide*, 254 Ill. App. 3d at 72.

The State argues that the trial court properly refused to respond to the jury's inquiry because a response would have opened "Pandora's box" and resulted in a colloquy. The State cites *Reid* (136 Ill. 2d 27) to support its argument. However, the State fails to recognize that the supreme court merely cautioned against answering jurors' questions which are "ambiguous." *Reid*, 136 Ill. 2d at 39. Notably, the State fails to explain how the question posed by the jury in the instant case is ambiguous. To the contrary, this court has held that a jury's request for a definition of a word contained in a jury instruction is not ambiguous. *Kamide*, 254 Ill. App. 3d at 72 (holding that the jury's request for the definition of "alcohol" is an explicit question of law); *Lovelace*, 251 Ill. App. 3d at 619 (holding that the trial court erred when it refused to provide a definition of the word "knowingly" after the jury requested clarification). In addition, the State fails to explain how providing a definition of the word "originated" would have resulted in a colloquy or opened "Pandora's box."

Having concluded that the trial court erred when it failed to instruct the jury properly as to the meaning of "originated," we must determine whether the error was harmless. An erroneous jury instruction is harmless if the result of the trial would not have been different absent the error. *Lovelace*, 251 Ill. App. 3d at 620.

After reviewing the record, we determine that the error was not harmless. It was critical to the defendant's case that the jury understand the meaning of "originated." Entrapment was the only theory the defendant could properly argue. In reversing this court's

original opinion, our supreme court held that the defendant: (1) had to admit that he had the criminal intent of solicitation of murder for hire (*Landwer*, 166 Ill. 2d at 488); and (2) was not entitled to the lesser included offense instruction (*Landwer*, 166 Ill. 2d at 489). Therefore, the defendant was left with only one defense, entrapment, and that defense relied considerably on the meaning of "originated."

In addition, the supreme court acknowledged that "at times the prosecutor confused the concept of defendant's criminal purpose with defendant's motive" during closing argument. *Landwer*, 166 Ill. 2d at 494. We agree with the defendant that the prosecutor's remarks likely added to the jurors' confusion.

The dissent states that "[i]t is only speculation to assume that any material prejudice to defendant resulted from the judge's handling of the question." 279 Ill. App. 3d at 320. However, our supreme court has stated that "upon review of a conviction the question is not whether guilt can be discerned from a record but 'whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials.' " *Childs*, 159 Ill. 2d at 231, quoting *Bollenbach v. United States*, 326 U.S. 607, 614-15, 90 L. Ed. 350, 355-56, 66 S. Ct. 402, 406 (1945). Given the considerable importance of the word "originated" in the defendant's only viable defense, and the prosecutor's confusing remarks regarding the necessary *mens rea*, we determine that the trial court's error was not harmless. Accordingly, we determine that the trial court's error in instructing the jury on the meaning of the word "originated" requires reversal of the trial court's judgment.

■ We now address the defendant's contention that the State failed to prove, beyond a reasonable doubt, that the defendant was guilty of solicitation of first degree murder for hire because the State failed to prove that the defendant was not entrapped. We disagree.

When a defendant challenges the sufficiency of the evidence on appeal, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). Further, we will not substitute our judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of a witness. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

Implicit in both the original appellate court decision and the supreme court decision was that the State provided evidence that, if believed, was sufficient to prove that the defendant was not entrapped

and that the defendant was guilty beyond a reasonable doubt of solicitation of first degree murder for hire. Accordingly, we reverse and remand this cause for a new trial.

The judgment of the circuit court of Du Page County is reversed, and the cause is remanded.

Reversed and remanded.

HUTCHINSON, J., concurs.

JUSTICE DOYLE, dissenting:

I respectfully disagree with the majority that the trial court's response to the jury's request for a dictionary or definition constituted reversible error.

Although I agree that the word "originated" is a key word in the entrapment instruction, it has a common meaning understandable to the average juror. It is not a term of art having any unique legal meaning, and it has not been defined by statute or pattern instruction. Rather than refusing to respond to the inquiry, the judge appropriately consulted the parties and provided what seems to me to be a sensible response: "The word 'originated' has a commonly understood and accepted meaning, and needs no further definition."

I do not interpret *People v. Childs* to require reversal in this case. The supreme court in *Childs* viewed the jury's inquiry as signaling that it was teetering on the verge of an incorrect application of the law in view of the trial court's having previously allowed the jury to consider lesser forms of homicide as an alternative to a felony murder resolution. At least some of the jurors were confused as to whether they could find the defendant guilty of armed robbery and one of the forms of manslaughter *instead* of murder. *Childs*, 159 Ill. 2d at 231. Although the jurors were given an instruction regarding murder during the commission of a forcible felony, no verdict forms were submitted for felony murder. 159 Ill. 2d at 229-30. Considering the unique posture of the case, it is readily apparent that the jury's inquiry manifested confusion as to an intricate and pivotal aspect of the instructions.

In contrast, it is undisputed that the jurors in the present case sought merely a dictionary definition of an easily understood word. Defendant does not contend that the trial court could have provided the jury with any special meaning of the word in the context of entrapment principles, and, when given an opportunity by the judge, defendant proposed no language for the response. If the trial court had granted the request for a dictionary definition, it appears that

the jurors would have received nothing more than common synonyms for the word "originated" such as "start," "initiate," or "begin." It seems improbable that such a response would have provided any material assistance to the jurors sufficient to affect the verdict. A trial court may decline to respond to a jury's question if the instructions are readily understandable and where further instructions would serve no useful purpose. *People v. Reid*, 136 Ill. 2d 27, 39 (1990). In any event, it is evident that the jury inquiry did not present a complex and confusing issue of law comparable to the dilemma confronting the jury in *Childs*, and, here, there is no clear indication that the jurors were on the brink of an incorrect application of the law.

I believe that the other cases relied upon in the majority's analysis are distinguishable.

In *People v. Oden*, 261 Ill. App. 3d 41 (1994), the State proceeded in a weapons possession prosecution on a theory that the defendant had actual and direct possession of firearms. The jury instructions, originally given, contained no explanation of the concept of constructive possession. It was evident from the jury's inquiry of the court, however, that it was considering convicting the defendant of possessing the firearms on a theory of constructive possession and wanted guidance on what would constitute constructive possession. Without consulting defendant or his counsel, the trial court refused to answer the inquiry. The appellate court reversed, holding that, given the jurors' obvious confusion, merely referring them to the instructions already given, even if complete and accurate, was insufficient to resolve the confusion. 261 Ill. App. 3d at 47. As in *Childs*, the inquiry presented a complex question of law which could be clarified only by the court's specialized knowledge. Here, however, the jurors' common knowledge of the word "originated" should have sufficed, once they were assured by the judge that the word held no special meaning.

*People v. Kamide*, 254 Ill. App. 3d 67 (1993), involved a problem of *incomplete* jury instructions in light of the evidence presented. On trial for driving under the influence of alcohol, the defendant explained that he had inhaled a medication containing nonethanol alcohol which produced a reading on the intoxilyzer. Although the applicable statutes provided for conviction only on intoxilyzer readings resulting from ethanol alcohol, which causes impairment of the brain's function, the trial court refused defendant's request to explain this difference in answer to the jury's specific request for that explanation. The trial court effectively failed to inform the jury concerning an essential statutory provision central to evaluating defendant's defense. In my view, *Kamide* provides little assistance in

resolving the issue before us where the jury was completely and accurately instructed.

In *People v. Lovelace*, 251 Ill. App. 3d 607 (1993), the original jury instructions were, again, *incomplete*. In an aggravated battery prosecution, the trial court failed to give the second paragraph of the pattern jury instruction definition of the term "knowingly." A key issue in the trial was whether the defendant knowingly caused bodily harm to a peace officer. The second paragraph of the instruction would have referred to the defendant's knowing the *result* of his conduct. IPI Criminal instructions committee comments indicate that the second paragraph is required when both conduct and result are in issue. The trial court refused the jury's request for " 'an interpretation of "knowingly and intentionally caused bodily harm." ' " 251 Ill. App. 3d at 618. The appellate court reversed, holding that the original instructions were incomplete and that the court had a duty to give the complete definition of "knowingly" when presented with the inquiry. I cannot equate the deficiency in *Lovelace* with the present issue involving only a request to define a commonly understood word.

Under appropriate circumstances, a court may exercise its discretion to refrain from answering a jury inquiry. *Reid*, 136 Ill. 2d at 39. A trial court is not required to answer a jury inquiry when the instructions are sufficient, and the court has the discretion to refuse a request for a dictionary. *People v. Petty*, 160 Ill. App. 3d 207, 213 (1987). Even if the majority is correct that a jury's request for a definition of a significant word in a jury instruction must be regarded as a question of law, it does not follow that the trial judge must invariably respond by providing the definition. Considering the variable circumstances which may pertain, there can be no precise formula for resolving such inquiries. Rather, these rulings must depend primarily upon an application of the trial court's discretion to the specific problems as they arise, and my reading of *Childs* does not indicate that the supreme court intended otherwise.

In the present case, the trial court could have exercised its discretion in favor of providing synonyms for the word "originated" to the jury. In my opinion, however, its decision to inform the jurors instead that they should apply the commonly understood and accepted meaning of the word was not an abuse of discretion and did not deny defendant a fair trial. It is only speculation to assume that any material prejudice to defendant resulted from the judge's handling of the question. Accordingly, I would affirm the judgment of the circuit court.