NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250243-U

NO. 4-25-0243

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 18, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| MAYA NODINE, | ) | No. 21CF195 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Michael L. Stroh, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Zenoff and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court conducted an adequate preliminary *Krankel* inquiry (see *People v. Krankel*, 102 Ill. 2d 181 (1984)) into defendant's *pro se* posttrial allegations of ineffective assistance of counsel, and the court's denial of defendant's *pro se* motion was not manifestly erroneous.

(2) Defendant failed to show her trial counsel provided ineffective assistance of counsel by not (a) calling Dr. Ryan Finkenbine as an expert witness at her trial and/or (b) asking the court to provide the jury with Illinois Pattern Jury Instructions, Criminal, No. 5.01B (approved Oct. 28, 2016).

(3) The trial court did not abuse its discretion by not allowing defendant to present evidence she had been raped approximately two years before the charged conduct at issue.

(4) Defendant failed to establish cumulative error occurred in this case.

(5) The State presented sufficient evidence for a rational trier of fact to convict defendant of first degree murder.

(6) The trial court erred by relying on an improper aggravating factor, requiring that defendant's sentence be vacated and the cause remanded for a new sentencing

hearing.

¶ 2        In January 2025, a jury convicted defendant, Maya Nodine, of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)). In March 2025, the trial court sentenced defendant to 30 years in prison. Defendant appeals, raising the following issues: (1) the State failed to prove her guilty of first degree murder because the evidence established that her mental state prevented her from considering the harm she could cause the driver of the other vehicle; (2) trial counsel was ineffective for failing to (a) introduce Dr. Ryan Finkenbine's testimony regarding the effect of defendant's mental health condition on her mental state at the time of the collision and (b) request the court provide the jury with Illinois Pattern Jury Instructions, Criminal, No. 5.01B (eff. Oct. 28, 2016) (hereinafter IPI Criminal No. 5.01B) in response to the jury's question during its deliberations; (3) the court erred when it prevented defendant "from testifying about the reasons behind her mental health condition and her desire to commit suicide because this information was relevant to explain her mental state at the time of the crash"; (4) she was deprived of a fair trial because of cumulative error; (5) her case should be remanded for the trial court to appoint independent counsel to represent her with regard to her posttrial *pro se* ineffective assistance of counsel claim (see *People v. Krankel*, 102 Ill. 2d 181 (1984)); and (6) the court considered an improper aggravating sentencing factor and imposed an excessive sentence on defendant. We affirm defendant's conviction but vacate her sentence and remand for a new sentencing hearing.

¶ 3                                    I. BACKGROUND

¶ 4        In January 2022, a grand jury indicted defendant on one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)), alleging "defendant without lawful justification turned her vehicle into an oncoming vehicle ***, causing the death of Joy Hatton, knowing at the time such an act created the strong probability of death or great bodily harm to the defendant or another

- 2 -

individual."

¶ 5        Defendant's first trial was held in September 2022. During the jury's deliberations, one juror was excused from service because she was using her watch to communicate during deliberations. After an alternate replaced the excused juror, the jury found defendant guilty but mentally ill. At a hearing on February 9, 2023, the trial court granted defendant's amended motion for a new trial because, prior to inserting the alternate into the jury, the court did not ask the alternate juror whether she had followed the court's instructions.

¶ 6        On March 1, 2023, defendant's second jury trial commenced. On March 6, 2023, the jury found defendant guilty of first degree murder. Defendant appealed.

¶ 7        In July 2024, this court reversed defendant's conviction for first degree murder after her second jury trial because her trial attorney, Maureen Williams, had a *per se* conflict of interest while representing defendant because the same state's attorney's office prosecuting defendant was simultaneously attempting to revoke Williams's second-chance felony probation. *People v. Nodine*, 2024 IL App (4th) 230269, ¶¶ 58, 73. Because our prior opinion provides a summary of what occurred in this case through defendant's sentencing hearing in March 2023 (*id.* ¶¶ 3-28), we need not restate that information here.

¶ 8        On remand, attorney Andew Lankton was appointed to represent defendant. Lankton filed no motions on defendant's behalf before her third trial began on January 13, 2025.

¶ 9                              A. Defendant's Third Trial

¶ 10       Following the State's opening statement in this case, defense counsel told the jury:

          "Ladies and gentlemen, there's a lot more to this case. You're going to hear
          that prior to this day, [defendant] was raped. You're going to hear testimony that
          she had been in a relationship after that rape with somebody that she had just found

- 3 -

out was underage. She got in an argument with her mom, and she was very upset. And in dealing with that, she's crying, she's trying to figure out what to do. She left the house for a drive to go calm down. And during that drive she swerved into an oncoming car. And instead of committing suicide, Ms. Hattan passed away.

***

Now, we will agree on many things. And I think we agree the major issue in this case, which [the State] has read the instruction to you. The second half of the instruction, whether [defendant] knew, the way she drove her vehicle, created a strong probability of death or great bodily harm. I think that's going to be the crux of this case. It's going to be up to you to decide. At the end of this case[,] I'm going to be asking you to find that the State did not prove the case beyond a reasonable doubt and to find [defendant] not guilty. Thank you."

¶ 11 Dennis Hattan, the victim's husband, testified he last saw his wife on the day of the collision, when she visited him at the hospital.

¶ 12 Scott Ireland, a volunteer firefighter and emergency medical technician, testified he responded to the collision. When he arrived at the scene, he went to one of the vehicles to assist, opened the rear passenger-side door, and gained access to defendant, who was the vehicle's only occupant. He assessed defendant and determined she had no life-threatening injuries. However, she was upset and crying. Defendant told Ireland she had swerved her vehicle into oncoming traffic to commit suicide and asked what happened to the other driver.

¶ 13 Sheriff's Deputy Sarah Lamlech testified she also responded to the scene of the collision. She spoke with defendant, who was inside a vehicle. Although defendant was upset and in pain, she was also clear-headed. Defendant had no trouble speaking and did not seem confused.

After Lamlech asked defendant what happened, defendant said she tried to kill herself by swerving into oncoming traffic. Defendant also said she was sorry and asked if the other driver was OK.

¶ 14 The parties stipulated Dr. Scott Denton, who performed Joy Hattan's autopsy, would testify Hattan died as a result of multiple blunt injuries due to an automobile collision. The parties also stipulated a camera at a veterinary hospital accurately recorded the incident. The State played this video for the jury.

¶ 15 Detective Albert Holocker testified he questioned defendant at the hospital. When he arrived at the hospital, defendant was not being actively treated. Holocker read defendant her *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and video-recorded his conversation with defendant. The State played this recording for the jury. Holocker testified defendant was lucid but also upset. Defendant told Holocker she had wanted to kill herself. Holocker then asked defendant if she thought about the person in the other vehicle. Defendant first shook her head no. However, after Holocker asked the question again, defendant said she did not care.

¶ 16 Trooper Christopher McClenning, a crash reconstruction expert with the Illinois State Police, testified he was in charge of the crash reconstruction. McClenning determined Hattan's vehicle was traveling at a constant rate of approximately 55 miles per hour before the crash. Hattan was wearing her seat belt. As for defendant's vehicle, McClenning testified it was traveling at 88 miles per hour before the crash, but defendant accelerated her vehicle to 91 miles per hour before the collision. According to McClenning, the accident occurred in Hattan's lane of traffic in an offset frontal collision.

¶ 17 Defendant testified on her own behalf that she was employed as a certified nursing assistant (CNA) before the collision at issue. When defense counsel asked whether she had any prior trauma in her life before the collision, the State objected to the broad nature of the question

and the relevance of any prior trauma. Outside the presence of the jury, the trial court and parties discussed the issue.

¶ 18    Defense counsel indicated he wanted to introduce evidence defendant was raped two years before the collision. Then, in the days leading up to the collision, defendant learned a person she was dating was only 16 years old. On the day of the crash, defendant and her mother had a serious argument about defendant's relationship with the 16-year-old. Defendant's mother told defendant she could be accused of statutory rape. Defense counsel argued defendant was upset about the possibility of being an accused rapist because she had been raped herself. The State continued to object to defendant testifying about being the victim of a rape two years earlier and also made a hearsay objection to the statements between defendant and her mother.

¶ 19    The trial court then ruled as follows:

"Okay. I do not see a problem with the defendant testifying as to her mental state at the time of the incident, or leading up to the time of the incident. I also do not see a problem for the defendant testifying as to why she was upset, that being, she had just found out that her current boyfriend [*sic*] was underage, and told her mother about it, and an argument ensued between the two. However, I do not see the probative value of a rape that occurred two years ago, and by your own proffer, was not really the impetus of her being upset. It was more that her boyfriend [*sic*] was underage and she didn't know about it, and she got into an argument with her mother. So I will allow you to establish her mental state. But as far as that, getting into her being raped two years ago, I do not find that to have probative value to the issue at hand and will not allow that testimony to be presented."

¶ 20    When the jury returned, defendant testified she had a conversation with her mother

- 6 -

on December 16, 2021, after she learned a few days earlier that the girl she was dating was only 16. Defendant said she understood dating a 16-year-old was wrong and her mother was concerned defendant could get into trouble for dating the minor. However, defendant said she did not want to hurt anyone. We presume defendant was referring to the female minor. Defendant and her mother had a heated conversation about the situation at defendant's house. Because defendant was 19, her mother expressed concern defendant could potentially be a sex offender. Defendant testified that was "a trigger for me." The conversation ended with defendant's mother asking if defendant wanted to be a sex offender.

¶ 21          According to defendant, after the argument, she went to her bedroom to try to settle down. She said she smoked marijuana to help with her anxiety and was looking for her "electronic dab pen." It was not in her room, so she checked her car. She found the dab pen, but it was "dead." She then messaged her mother and said she was sorry. She got into her car to take a drive and try to calm down. Defendant testified she was in the midst of a panic attack at that point—"hysterical, sobbing audibly, having trouble breathing, shaky." She drove from her house, turned onto Route 89 and toward Metamora, Illinois. Defendant indicated she did not know how fast she was going, could not calm down, and was feeling worse instead of better. According to defendant:

> "At some point, I don't know exactly the point I was at in the road or whatever, but I just *** I'm sorry. I just felt that I didn't want to live anymore. And *** I don't even really know if it formed as a complete thought, or just an overwhelming feeling, but *** I had a moment where *** I can only describe it as a blankness. I wasn't crying anymore, but I also—I don't know. I just—I just swerved."

She testified she did not intend on committing suicide when she left her house. Defense counsel then asked, "[A]t this moment of blankness, did you plan on committing suicide?" She responded,

"I really don't think *** I did, *** I just blanked out, and I just swerved and hit the car."

¶ 22     Defense counsel and defendant then had the following exchange regarding her interview with Detective Holocker:

"Q. Well, at one point you were asked about something along the lines of, did you know you were going to hit somebody, and you shook your head. What did you mean when you shook your head?

A. No.

Q. And then you were asked again, and there was a response of, I didn't care. What did you mean?

A. I just meant that *** I didn't care to consider anything else other than the fact that I wanted to die. I don't even know why I said that, because that's not true.

Q. What's not true?

A. That *** I didn't care about taking the life of another person or—I don't remember exactly what Mr. Holocker asked me, but I definitely do care about what I did, and the people I affected, and the decision I made."

Defendant testified she did not know who was in the other vehicle or what kind of vehicle it was when she swerved. At the point she swerved, she did not think about what was going to happen. When asked why not, defendant said, "I don't know. It was just an impulsive reaction I guess. I don't really—I don't really know."

¶ 23     On cross-examination, defendant testified she graduated from high school in 2021 and usually received "As and Bs." She testified she had made the honor roll. After high school, she briefly attended Illinois Central College and was earning "As and Bs" there, as well. She also

acquired a certification to be a CNA. She had her driver's license but received a "D" in driver's education.

¶ 24    Defendant admitted she told Lamlech and Ireland at the scene of the collision she was trying to kill herself. She also told Holocker she intended to kill herself. When the State questioned defendant about the inconsistency between her prior testimony on direct examination and her statements to Lamlech, Ireland, and Holocker, the following exchange occurred:

"Q. And now today, three years later, a little more than three years later, you're saying that wasn't your intent?

A. No, that's not what I'm saying.

Q. What are you saying?

A. I'm saying that it wasn't a—I didn't get in the car with the intention to commit suicide.

Q. But why did you swerve?

A. To commit suicide."

Defendant indicated she became progressively more upset while she was driving but did not stop anywhere or call anyone. The State and defendant then had the following exchange after the State asked what happened to make her suddenly decide to commit suicide:

"A. I honestly don't know. It was just such overwhelming emotions. *** I wish I could give you a clear answer as to why I did that. But I just—I just—I didn't want to be here anymore.

Q. So you get overwhelmed to the point that you decide to end your life, correct?

A. Yes.

Q. And you decide, I'm going to swerve into that car, because swerving into that car could end your life?

A. I'm not sure I had that exact thought but that's—

Q. I mean, you see another car?

A. Generally.

Q. You see another car. That car's driving at you. You know that if you go head-on into another vehicle it could kill you?

A. Generally, yes.

* * *

Q. And you speed up. And decide, I'm going to hit those headlights in front of me to end my life?

A. Yes.

Q. Because I know in my head that running head-on into another vehicle could kill me?

A. Yes.

Q. Okay. Or kill somebody else?

A. That never—

Q. You didn't know that going head-on into another vehicle could kill somebody else, you thought that it was only going to kill you?

A. I mean, if you had asked me that before that car accident I would have said yes. But at that moment I was thinking of nothing else."

¶ 25    On redirect examination, when asked how much time passed between her making a decision to commit suicide and swerving into the oncoming vehicle, defendant said, "Seconds."

Then, on recross-examination, defendant said that after the collision, she knew her actions could have seriously hurt or killed someone else. When questioned by defense counsel again, defendant said:

> "When the car was still, I remember just sitting there for a moment and then I remember thinking, what did I just do[?] And then I started reaching around to see if I could find my phone to get ahold of my mom. And then it was kind of at that point that it occurred to me that I could have hurt somebody else."

¶ 26 The trial court gave the jury the following instructions relevant to this appeal:

> "A person commits the offense of first degree murder when she kills an individual if in performing the act which caused the death, she knows that such act creates a strong probability of death or great bodily harm to that individual or another.
>
> To sustain the charge of first degree murder, the State must prove the following propositions: First proposition, that the defendant performed the act which caused the death of Joy Hattan.
>
> And second proposition: That when the defendant did so, she knew that her act created a strong probability of death or great bodily harm to Joy Hattan.
>
> If you find from your consideration of all of the evidence in this case that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all of the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.
>
> A person commits the offense of reckless homicide when she

unintentionally causes the death of an individual by driving a motor vehicle recklessly and in a manner likely to cause death or great bodily harm.

To sustain the charge of reckless homicide, the State must prove the following propositions: First proposition, that the defendant caused the death of Joy Hattan by driving a motor vehicle.

And second proposition: That the defendant drove a motor vehicle recklessly.

And third proposition: That the defendant drove a motor vehicle in a manner likely to cause death or great bodily harm.

If you find from your consideration of all of the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all of the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant guilty.

A person acts recklessly when she [consciously] disregards a substantial and unjustifiable risk that circumstances exist, or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

¶ 27    During its deliberations, the jury sent a question to the trial court, asking as follows: "To sustain the charge of first degree murder under the second proposition, at what point does the defendant need to know that her act created a strong probability of death or great bodily harm to Joy Hattan? Example one, at any point in her adult life? Two, moments before she swerved her vehicle?"

¶ 28    The State requested the trial court to instruct the jury to rely on the instructions they were already given. The court stated it agreed but sought input from defense counsel, who responded: "I think that's correct. I think we all know what the answer is, but the answer to the jury needs to be referred to the instructions." The court then stated:

> "The answer to the question is in the instructions. I think the—I went and pulled the instructions to first degree murder, and if you read the two propositions together it very clearly answers that question. So *** my answer to the jury is just going to be: You are to rely upon the jury instructions provided to you in reaching your decision. I don't think there's really anything else I can tell them."

The State and defense counsel agreed.

¶ 29    The jury later found defendant guilty of first degree murder.

¶ 30        B. Preliminary *Krankel* Hearing and Sentencing Hearing

¶ 31            1. *Defendant's Letter to the Court*

¶ 32    On March 13, 2025, the parties appeared for a sentencing hearing. The trial court noted defendant had sent a letter to the court complaining defense counsel should have called Dr. Finkenbine to testify at her trial. The letter, dated January 31, 2025, asked the court to consider granting her a new trial because she received ineffective assistance of counsel. In the letter to the court, defendant referenced a letter she received from her prior appellate counsel, Manuela Hernandez (Hernandez letter). (We note Hernandez is also representing defendant in this appeal.) Hernandez stated in her letter that it would be important for defendant's next trial attorney to have Dr. Finkenbine testify at defendant's retrial. Hernandez also indicated she had cited cases in her briefs to the appellate court that could help defendant.

¶ 33    In defendant's letter to the trial court, she wrote that, prior to receiving the

Hernandez letter, Lankton had told defendant that "the court would deny Dr. Finkenbine's testimony[ ] because it would only support a diminished capacity or insanity defense." Defendant then asserted she also sent a letter to Lankton's office on December 9, 2024, asking Lankton "to try to get Dr. Finkenbine's testimony despite his concerns, to take a look at the briefs, to send me a copy of the briefs, and to speak with me as soon as possible." (This quoted material is from defendant's letter to the court and not her letter to Lankton.)

¶ 34　　　　Defendant also stated in her letter to the trial court that she called Lankton's office in December and spoke with a woman named Ally, who defendant asked if Lankton had received the letter she sent to him. Ally indicated she would check for the letter.

¶ 35　　　　Additionally, in her letter to the trial court, defendant asserted she spoke with Lankton five days before her trial on January 8, 2025, showed him the Hernandez letter, and asked him about Dr. Finkenbine's testimony. According to defendant's letter to the court:

> "After reading the document[,] he asked me if I had the briefs[.] I then asked him if he received my letter, to which he appeared confused. He stated he had not gotten my letter, and reiterated that Dr. Finkenbine would only be beneficial at sentencing, not trial.
>
> When Mr. Lankton came to see me once more on January 10, 2025, this is what he said[:]
>
> 'I spoke with Dr. Finkenbine, he doesn't want to testify [at] trial. He didn't feel comfortable testifying the last time, but he is willing to testify at sentencing.'
>
> This statement struck me as odd, but I said nothing because I [was] unsure and decided to trust my counsel. I had also really wanted to see the briefs but at this point it seemed too late. I just recently found out that this is not proper procedure.

I believe that my counsel was ineffective[,] and I would ask the court to consider granting a new trial. Thank you for your time."

¶ 36                    2. *Preliminary Krankel Hearing*

¶ 37      The trial court noted a preliminary *Krankel* inquiry needed to be held. The court told defendant it had read her letter and asked defendant what she claimed was ineffective about her attorney's representation. Defendant indicated Hernadez had sent defendant a letter indicating she believed it was important for defendant to have Dr. Finkenbine testify at her trial. Defendant asserted she had passed this information on to Lankton. However, Lankton told her that Dr. Finkenbine's testimony would be more beneficial at her sentencing hearing as opposed to her trial. Defendant's mother passed this information on to Hernandez, who responded trial counsel should have attempted to have Dr. Finkenbine testify at trial, even if the attempt might have potentially been objected to by the State and denied by the trial court.

¶ 38      The trial court then asked Lankton about the allegations of his ineffectiveness. Lankton indicated he and defendant had conversations regarding whether Dr. Finkenbine would testify. In response to the court's question regarding Lankton's reasoning for not having Dr. Finkenbine testify at trial, counsel stated:

     "Judge, first off, this letter that she's referring to, she never showed it to me. I asked to see it, and she didn't have it. I reached out to Manuela Hernandez personally and spoke to her. I actually watched the appellate arguments on that case. After doing all that I wasn't persuaded that—that diminished capacity was an argument to be had at trial.

     I did reach out to Dr. Finkenbine. He very strongly felt that insanity was not something that he could support as a defense. He had been clear with that with prior

counsel. He was of a strong opinion—and I have him here to testify today regarding [defendant's] mental state at the time of the offense, and that's where it properly should be had, is today at sentencing."

When the court asked Lankton if he believed his decision not to have Dr. Finkenbine testify was a matter of trial strategy, counsel gave an affirmative response. Lankton also indicated he talked with defendant about his plans regarding Dr. Finkenbine. When the court turned back to defendant for further comment, defendant indicated she had nothing more to say.

¶ 39     The trial court denied defendant's *pro se* motion alleging ineffective assistance of counsel by Lankton for not attempting to call Dr. Finkenbine at trial. The court explained:

"The court has conducted an examination of the factual basis of the defendant's claim. Both in reviewing the defendant's *** letter that was submitted to the court and by questioning both [defendant] and [defense counsel], in considering those—that document and the statements by [defense counsel] and [defendant], the court comes to the conclusion that this is a matter of trial strategy and does not pertain to neglect by [defense counsel] in trying this case in representation of the defendant. Therefore, pursuant to *Krankel*, the court is going to deny the defendant's *pro se* motion, which is the page[-]and-a-half letter which I am taking as a motion."

¶ 40     3. *Sentencing Hearing*

¶ 41     Although Dr. Finkenbine did not testify during defendant's trial, he did testify as an expert in the field of forensic psychology at her sentencing hearing. Dr. Finkenbine testified he had interviewed defendant on June 10, 2022, to assess her criminal responsibility for the charges against her. According to Dr. Finkenbine, he did not find sufficient evidence to support an insanity

defense in this case. However, it was his opinion defendant had major depressive disorder and posttraumatic stress disorder (PTSD). He also noted she experienced panic attacks, which he believed were associated with her PTSD.

¶ 42     Based on his interview with defendant, Dr. Finkenbine indicated it was his understanding defendant was distraught just prior to swerving into the oncoming vehicle. He testified:

"Some of the symptoms of both depression and [PTSD] were present in that she was effectively having misguided thoughts about what it meant to have a relationship with a partner. And having had an argument with her mother and seeking relief from that unpleasant emotional state she initially intended to use a vape pen or a dab pen, and the pen was in the car. And she had—it was in the car to drive. The pen didn't work. And just moments prior to the swerving of the car she had an impulse to end her life to relieve herself of that emotional pain."

When asked how the conditions would have affected her thinking at that moment, Dr. Finkenbine answered:

"She didn't have complex or significant forethought with regard to the consequences of the behaviors, particularly to others than herself. Her thoughts were at the time narrow, self-centered, and limited relative to somebody who was not in that emotional state. And she had a lack of impulse control to manage the impulse to die or to relieve—or to otherwise relieve herself of pain."

Defense counsel then asked Dr. Finkenbine if he had come to a conclusion regarding whether defendant contemplated the effects of her conduct. He responded, "I don't believe she contemplated the effects of the conduct one way or the other. The only contemplation beyond—I

- 17 -

should say beyond the impulse to kill herself." The doctor stated he did not believe defendant's conduct would likely reoccur, explaining as follows:

"[F]irst of all, a lot of the compulsive behaviors at the time were driven by the depression, [PTSD], youthfulness, immaturity. And as people grow and mature and they expand their repertoire of coping mechanisms and skills there are many additional, safe behaviors to manage emotions. In my experience working with thousands of patients, youthful patients, teenagers, young adults tend not to have the same repertoire of behaviors to cope with things like *** romantic relationships that go awry, arguments with friends and family members. And their ability to manage those behaviors are much limited.

So as people grow and mature and they gain experience they're less likely to conduct themselves in a way that would be harmful or dangerous. In addition, management, as I wrote in my report, of the depressive symptoms and the PTSD would help reduce the likelihood that those would impact the impulsiveness and— and management or lack of management of those impulses."

¶ 43      On cross-examination, Dr. Finkenbine acknowledged he was not present at the time of or after the accident occurred. His analysis was based on his interview with defendant and hearsay statements. Dr. Finkenbine acknowledged defendant crashed into another car with the belief death could occur. However, he opined defendant was only worried about her own death and did not think about whether anyone else would die. Further, Dr. Finkenbine indicated he could not rule out completely that defendant did not know driving into oncoming traffic could cause the death of someone else, considering that at the hospital, defendant indicated she did not care if the accident affected another person. While he indicated his opinion could be wrong, he stated his

opinion was based on his experience working with people who have depression and PTSD and have either contemplated harming themselves or actually done so.

¶ 44        Dr. Finkenbine stood by his opinion defendant's "behaviors were self-oriented with the intent to commit suicide as opposed *** to commit harm to someone else." He indicated his belief was based on the impulsiveness of defendant's behavior. According to Dr. Finkenbine:

> "In this case because of the emotional state that she was in, her youthfulness, the major depressive order symptoms at that time, the PTSD symptoms in particular at that time, lead me to clinically believe that she did not have the time to contemplate. She did not put time and place between the impulse to kill herself and to say hmm, I wonder [what] would happen if I drove my car into an oncoming vehicle other than to kill myself. And I think it actually is supported that she later says I *** didn't really care what happened to that other person. She has had some time now to think about it, and she was accurate that she didn't care. She cared about what happened to herself. Because she didn't have at that moment a thought one way or the other about the other party. In retrospect she can say I didn't care. I think now more recently, at least at the time I interviewed her, she cared very much. There was plenty of time between the impulse to kill herself and the contemplation of what occurred."

With regard to his opinion defendant was not likely to do something like this again, he explained:

> "I am taking into context her situation, that is as an individual. If she were a patient sitting across from me, I would consider that she was reportedly a good student, that she was employed, that she had a sense of, you know, who she was and her future, that she was hoping to kind of overcome some trauma that she had

incurred 18 months earlier. And that in combination with simple maturation, a desire to do well, would tell me that she is less likely than somebody in a similar situation without those characteristics, that is, somebody who is maybe not employed, doesn't have a supportive family, isn't as bright, who is more likely to behave in criminal behavior. These are factors that support that."

However, he agreed no one can foresee the future.

¶ 45        Defendant provided the trial court with a statement in allocution.

¶ 46        Noting the sentencing range in this case was 20 to 60 years, with 100% of the sentence to be served, the State asked the trial court to sentence defendant to 35 years in prison.

¶ 47        Defense counsel noted defendant was 22, with no prior criminal history. Further, she had PTSD and a depressive disorder but also earned a high school degree and a CNA certificate. According to defense counsel, this was not a malicious act by defendant. Counsel argued her mental condition "substantially affected her ability to understand the nature of her acts and to conform *** her conduct to the requirements of the law." Defense counsel asked the trial court to impose the minimum 20-year prison sentence.

¶ 48        In announcing defendant's sentence, the trial court stated it had considered the evidence presented at trial, the presentence investigation report, the financial impact of incarceration, the evidence presented by the parties in aggravation and mitigation, the respective arguments made by counsel, and defendant's written statement in allocution. As for mitigating factors, the court noted defendant argued she "did not contemplate that her criminal conduct would cause or threaten serious physical harm to another." However, the court also noted defendant was found guilty of first degree murder for knowingly acting in a way she knew would cause death or great bodily harm.

¶ 49 The trial court also recognized defendant had no criminal history, it was unlikely she would commit another crime, and her criminal conduct resulted from circumstances unlikely to reoccur. However, the court also stated this was no guarantee it would not happen again. The court also found Dr. Finkenbine's testimony established as a mitigating factor that " 'at the time of the offense the defendant was suffering from a serious mental illness, which though insufficient to establish the defense of insanity, substantially affected her ability to understand the nature of her acts or to conform her conduct to the requirements of [the] law.' "

¶ 50 As for aggravating sentencing factors, the trial court stated:

"In aggravation the court *** finds that the defendant's conduct caused or threatened serious physical harm to another, that being Ms. Joy Hattan. And that a sentence is necessary to deter others from committing the same crime."

¶ 51 In considering the nature and circumstances of the offense, the court noted defendant was despondent at the time of the offense. According to her own testimony and Dr. Finkenbine's testimony, she was having a panic attack. On impulse, she "decided to veer her car into oncoming traffic in order to end her own life."

¶ 52 The trial court recognized the victim, Joy Hattan, was coming home from visiting her husband, who was in the hospital. It was the Christmas season, and Hattan was traveling the speed limit in her vehicle.

¶ 53 In addressing defendant, the trial court stated her actions were selfish and took the life of a 47-year-old mother and wife. The court noted this was a tragic incident and it was impossible to fashion a sentence that would bring peace to anyone in the courtroom. While expressing its condolences to the victim's family, the court stated defendant had no ill intent toward the victim. The court then sentenced defendant to 30 years in the Illinois Department of

Corrections.

¶ 54        After the trial court announced defendant's sentence, defense counsel told the court defendant did not want to challenge her sentence and asked the clerk's office to file a notice of appeal. The court admonished defendant she would need to file a written motion to reconsider sentence within 30 days if she wanted to challenge any part of her sentence or the sentencing hearing. Further, the court informed defendant that any issue or claimed error regarding her sentence or any part of the sentencing hearing not raised in the written motion would not be considered by the appellate court. When the court asked defendant if she understood her appeal rights, did not want to challenge her sentence, and wanted to file a notice of appeal that day, defendant answered, "Yes, sir."

¶ 55        This appeal followed.

¶ 56                                II. ANALYSIS

¶ 57        As noted above, defendant raises the following issues on appeal: (1) the State failed to prove her guilty of first degree murder because the evidence established that her mental state prevented her from considering the harm she could cause the driver of the other vehicle; (2) her trial counsel was ineffective for failing to (a) introduce Dr. Finkenbine's testimony regarding the effect of defendant's mental health condition on her mental state at the time of the collision and (b) request the trial court provide the jury with IPI Criminal No. 5.01B in response to the jury's question during its deliberations; (3) the court erred when it prevented defendant "from testifying about the reasons behind her mental health condition and her desire to commit suicide because this information was relevant to explain her mental state at the time of the crash"; (4) she was deprived of a fair trial because of cumulative error; (5) her case should be remanded for the trial court to appoint independent counsel to represent her with regard to her posttrial *pro se* ineffective

assistance of counsel claim; and (6) the court considered an improper aggravating sentencing factor and imposed an excessive sentence on defendant. We do not address the issues in the order they were argued by defendant.

¶ 58          A. Posttrial *Krankel* Hearing and Ineffective Assistance of Counsel Claims

¶ 59          We initially examine defendant's claim the trial court erred by not appointing independent counsel to assist her with her *pro se* posttrial claim her trial counsel was ineffective. We then consider her arguments on appeal regarding the effectiveness of her trial counsel.

¶ 60          1. *Challenges to the Decision Not to Call Dr. Finkenbine at Defendant's Trial*

¶ 61          We first look at defendant's arguments regarding Lankton's decision not to call Dr. Finkenbine to testify at her trial. After her trial but before sentencing, defendant sent a *pro se* letter to the trial court alleging Lankton was ineffective for failing to call Dr. Finkenbine as a witness at trial. The letter also can be read as suggesting Lankton was neglecting her case. However, defendant's letter did not suggest, either explicitly or implicitly, that Lankton did not understand the law regarding the potential admissibility of Dr. Finkenbine's expert testimony. However, on appeal, defendant's appellate counsel essentially argues Lankton did not call Dr. Finkenbine to testify because he incorrectly believed diminished capacity evidence was *per se* inadmissible during defendant's trial. In other words, the claims defendant made *pro se* in the trial court regarding Lankton's ineffectiveness are different than the claims her appellate counsel now makes. We will judge the adequacy of the preliminary *Krankel* hearing and the merits of the court's ultimate decision to deny defendant's *pro se* motion based on the claims made in the trial court and not the new claims defendant makes on appeal about the preliminary *Krankel* hearing.

¶ 62          a. *Pro Se* Posttrial Ineffective Assistance of Counsel Claims

¶ 63          We first consider defendant's argument the trial court erred by not appointing

independent counsel to represent her with regard to her *pro se* posttrial claim Lankton was ineffective. In *Krankel*, 102 Ill. 2d at 189, our supreme court placed an obligation on trial courts to address a defendant's posttrial *pro se* claim or claims of ineffective assistance of counsel. After the supreme court decided *Krankel*, a common law procedure developed to determine whether a trial court must appoint independent counsel to represent a defendant with regard to an ineffective assistance claim. *People v. Jackson*, 2020 IL 124112, ¶ 95. The procedure " 'is intended to promote consideration of *pro se* ineffective assistance of counsel claims in the trial court and to limit issues on appeal.' " *Id.*

¶ 64 Our supreme court has explained:

"New counsel is not automatically appointed in every case when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. Rather, when a defendant makes such a claim, the trial court should first examine its factual basis. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. [Citations.] The new counsel would then represent the defendant at the hearing on the *pro se* claim of ineffective assistance of counsel. The appointed counsel can independently evaluate the *pro se* claim and avoid the conflict of interest that defendant's trial counsel would experience in trying to justify his or her actions contrary to the defendant's position. [Citations.] The applicable standard of review depends on whether the trial court did or did not determine the merits of the defendant's *pro se* posttrial claims of ineffective assistance of counsel. [Citation.] 'The operative concern for the reviewing court is

- 24 -

whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel.' [Citation.] Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*. [Citations.] However, if the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous. [Citations.] Manifest error is error that is clearly evident, plain, and indisputable." *Id.* ¶¶ 97-98.

¶ 65    At the scheduled sentencing hearing in this case, the trial court recognized defendant had made a *pro se* posttrial claim her trial counsel was ineffective in a letter dated January 31, 2025, that she sent to the trial court. The court then conducted a preliminary *Krankel* inquiry into defendant's claims in her letter.

¶ 66    The trial court first indicated it had examined defendant's *pro se* letter containing the factual basis for her claim. Defendant's letter to the court referred to another letter defendant received from Hernandez, who represented defendant in her prior appeal and is representing defendant in this appeal. Defendant's *pro se* letter claimed the Hernandez letter stated defendant's trial counsel should try to have Dr. Finkenbine testify at defendant's new trial and further stated the appellate briefs from defendant's prior appeal included helpful citations. Defendant's letter suggested Lankton was ineffective because he neglected the case by not investigating Hernandez's suggestion he call Dr. Finkenbine at defendant's trial and also for ultimately failing to call Dr. Finkenbine at her trial. According to defendant's letter, Lankton had previously told her the trial court would not allow Dr. Finkenbine to testify during her trial because his testimony only supported a diminished capacity defense.

¶ 67      Defendant's letter provided the following specific allegations regarding what she claimed occurred before her trial. Defendant said she sent Lankton a letter a little over one month before her trial, asking him "to try to get Dr. Finkenbine's testimony despite his concerns, to take a look at the briefs, to send me a copy of the briefs, and to speak with me as soon as possible." Additionally, defendant said she asked a woman in Lankton's office named Ally if Lankton had received her letter and Ally said she would check for the letter.

¶ 68      Defendant's letter further asserted that when she next spoke with Lankton on January 8, 2025, which was five days before her trial, she showed Lankton the Hernandez letter. Lankton read the Hernandez letter and asked defendant if she had the briefs to which Hernandez referred. When defendant asked Lankton if he got her letter, he said he did not and reiterated that Dr. Finkenbine's testimony would only be beneficial at sentencing, not defendant's trial.

¶ 69      Then, according to defendant's letter to the trial court, on January 10, 2025, Lankton visited her and told her he had spoken with Dr. Finkenbine, the doctor did not want to testify at trial, but the doctor was willing to testify at defendant's sentencing hearing. According to defendant's letter: "This statement struck me as odd, but I said nothing because I [was] unsure and decided to trust my counsel. I had also really wanted to see the briefs but at this point it seemed too late. I just recently found out that this is not proper procedure."

¶ 70      After the trial court noted it had read defendant's letter, the court specifically asked defendant, "What are you claiming has been ineffective about your attorney?" Defendant offered the following response:

> "I had had—actually, my mother had briefly spoken with my public
> defender from my Appellate Court, Ms. Manuela Hernandez, and I had told Ms.—
> or I had told my mother how I had asked Mr. Lankton to at least try to get Dr.

Finkenbine on in the trial. And he had explained to me that—that he would be more beneficial at the sentencing hearing. When my mother had told [Hernandez] that [Hernandez] had said *** that's not protocol, that regardless that Mr. Lankton should have at least attempted to get Mr. Finkenbine in trial even if the court decided *** that wasn't allowed. So she had told me to just write this letter, and I did. And I currently have with me a letter that [Hernandez] had sent me when I first arrived back in Woodford County, which I did show Mr. Lankton. Basically[,] it just says that she thinks it's important for *** Mr. Finkenbine to have his testimony in the trial."

While defendant's statement to the court suggested she had the Hernandez letter with her at the preliminary *Krankel* hearing, the Hernandez letter is not contained in the record on appeal.

¶ 71    The trial court then turned its attention to Lankton. Upon inquiry, Lankton advised the court he and defendant had conversations regarding Dr. Finkenbine's possible testimony. The court then asked Lankton what his reasoning was for not having Dr. Finkenbine testify at defendant's trial. In response, Lankton denied defendant showed him the Hernandez letter. Further, Lankton said he asked to see the letter, but defendant did not have it.

¶ 72    According to Lankton, he spoke to attorney Hernandez and watched the appellate arguments—presumably from defendant's prior appeal. Lankton then stated: "After doing all that I wasn't persuaded that—that diminished capacity was an argument to be had at trial." Moreover, Lankton noted he had reached out to Dr. Finkenbine, but the doctor indicated he could not support an insanity defense for defendant. However, Lankton said the doctor had a strong opinion regarding defendant's mental state at the time of the offense and planned to testify at the sentencing hearing. When the court asked Lankton if he believed his decision not to have Dr. Finkenbine

testify at the trial was a matter of trial strategy, Lankton said it was. Lankton also said he discussed this with defendant.

¶ 73　　The trial court provided defendant an opportunity to respond, but she indicated she had nothing else to say.

¶ 74　　After reviewing defendant's letter and questioning both defendant and Lankton, the trial court found Lankton's decision not to call Finkenbine at trial constituted a matter of trial strategy and not neglect. Therefore, the court denied defendant's *pro se* motion alleging ineffective assistance of counsel.

¶ 75　　Based on our *de novo* review, we conclude the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. Because we have concluded the trial court conducted an adequate inquiry into defendant's *pro se* claims of ineffective assistance of counsel, we will not disturb the trial court's denial of defendant's *pro se* motion unless the court's decision was manifestly erroneous.

¶ 76　　On appeal, defendant contends the trial court's determination Lankton made a strategic decision and did not neglect defendant's case was manifestly erroneous. According to defendant's argument on appeal, Lankton's "explanation as to why he decided not to call Dr. Finkenbine did not make sense." Defendant essentially contends Lankton did not understand the current state of the law and believed evidence regarding defendant's diminished capacity was *per se* inadmissible, which is why Lankton only called Dr. Finkenbine as a witness at defendant's sentencing hearing and not her trial. Consequently, the trial court erred in finding the failure to call Dr. Finkenbine constituted trial strategy.

¶ 77　　The problem with this argument is that, at the preliminary *Krankel* hearing, defendant did not specifically allege Lankton's decisions regarding Dr. Finkenbine's testimony

were based on his misunderstanding of the law. Instead, defendant claimed the Hernandez letter said defendant's trial counsel should try to get Dr. Finkenbine to testify at trial and defendant later told Lankton to try to get Dr. Finkenbine to testify despite his concerns.

¶ 78     If *his concerns* means Dr. Finkenbine's concerns, then according to defendant's own allegations, Lankton must have spoken with Dr. Finkenbine, and the doctor indicated he did not want to testify at trial. However, if *his concerns* is referring to Lankton's own concerns regarding the admissibility of Dr. Finkenbine's testimony at defendant's trial, this still is not an assertion defendant did not understand the law.

¶ 79     As our supreme court stated in *Jackson*, the decision to call a witness is generally seen as a strategic decision. *Jackson*, 2020 IL 124112, ¶ 106. Allegations related to trial strategy cannot serve as the basis for a *Krankel* claim. *Id.*

¶ 80     Defendant only alleged Lankton was ineffective for not calling Dr. Finkenbine and essentially ignoring Hernandez's suggestion to try and have the doctor testify. However, if Dr. Finkenbine told Lankton he did not want to testify at defendant's trial, as defendant suggests Lankton claimed, the doctor's unwillingness to testify would lend credence to Lankton's decision not to call him as a strategic matter. Further, Lankton told the trial court he had spoken with Hernandez and watched the oral arguments, presumably from defendant's prior appeal.

¶ 81     Given the trial court's ruling, we presume the court found Lankton's claims he consulted with Hernandez, watched the oral arguments, and determined not to call Dr. Finkenbine as a matter of trial strategy to be credible.

¶ 82     In explaining his actions, Lankton said he spoke with Hernandez personally, reviewed the oral arguments, presumably from the prior appeal in this case, and, after doing all that, was not persuaded "that diminished capacity was an argument to be had at trial." This

statement does not clearly establish Lankton did not understand the law. While inartful, Lankton could have been indicating diminished capacity evidence, such as how defendant's diagnoses impacted her mental state, would not be admissible at defendant's trial because of the specific circumstances of her case.

¶ 83    As a result, based on the claims before the trial court, we do not fault the court for not specifically asking Lankton whether he believed Dr. Finkenbine's testimony regarding defendant's mental state at the time of the collision was *per se* inadmissible or if he believed the evidence was inadmissible at trial based on the specific facts in this case. There was no reason developed in the record to suggest this inquiry was necessary or appropriate. While the issue of the admissibility of diminished capacity evidence had been an issue in the trial court prior to this court reversing defendant's conviction and remanding this case for a new trial in July 2024, it is important to note Judge Stroh, whose decisions are at issue in this appeal, did not begin presiding over this case until September 2024. Because Lankton did not attempt to call Dr. Finkenbine at defendant's trial, it does not appear Judge Stroh had to consider the issue of diminished capacity evidence in this case until the court received defendant's *pro se* posttrial letter alleging Lankton had been ineffective.

¶ 84    Based on the specific *pro se* allegations of ineffective assistance defendant made in the posttrial letter and at the preliminary *Krankel* hearing, we cannot conclude the trial court's denial of defendant's *pro se* claim was manifestly erroneous.

¶ 85    b. Remaining Arguments Regarding Dr. Finkenbine's Testimony Raised on Appeal

¶ 86    We next turn to defendant's other arguments as to why Lankton was constitutionally ineffective because he did not call Dr. Finkenbine as an expert witness at defendant's trial. To establish ineffective assistance of counsel, a defendant must show both her

counsel's performance was deficient and she was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "There is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." *People v. Enis*, 194 Ill. 2d 361, 377 (2000). Reviewing courts should be "highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007).

¶ 87    Defendant's appellate counsel, Hernandez, cites the First District's recent opinion in *People v. Valdez*, 2022 IL App (1st) 181463, and our supreme court's recent decision in *People v. Grayer*, 2023 IL 128871, to support her argument Lankton was ineffective.

¶ 88    In *Valdez*, the First District examined Illinois law regarding the admissibility of evidence regarding a defendant's diminished capacity. The court noted its decision in *People v. Hulitt*, 361 Ill. App. 3d 634, 641 (2005), "held that diminished capacity is not recognized in Illinois, and thus a defendant may not introduce evidence of his mental defect or infirmity to disprove the *mens rea* element of this offense." *Valdez*, 2022 IL App (1st) 181463, ¶ 101. After *Hulitt* was decided, "other published decisions *** upheld the exclusion of psychiatric testimony to disprove the *mens rea* element of the charged offense, in part, based on *Hulitt*." *Id.* The First District then stated, "From *Hulitt*, then comes this rather broad-sweeping principle that Illinois does not recognize a 'diminished capacity defense,' and it is thus improper for a defendant to introduce such evidence to claim that the State failed to establish the required *mens rea* element of the

offense." *Id.* ¶ 102. However, the First District indicated the facts in *Valdez* forced the court to reexamine its holding in *Hulitt*. *Id.*

¶ 89        The First District acknowledged that diminished capacity is not recognized as an affirmative defense. *Id.* ¶ 121. According to the First District:

> "[H]owever, when a defendant seeks to admit evidence that challenges the *mens rea* element of a crime, the defendant *is* attacking the State's proof; he is claiming that the State cannot prove him guilty of all elements beyond a reasonable doubt. That is obviously not the same thing as asserting an affirmative defense. There is no shift in the burden or standard of proof. And whether that evidence is admissible is not dependent, in any way, on whether it satisfies or does not satisfy the elements of some affirmative defense. It is dependent, instead, on whether the evidence satisfies the requirements of the Illinois Rules of Evidence. [Citation.]
>
> We thus fail to see why evidence of a defendant's mental state is *per se* inadmissible under Illinois law simply because that evidence would not support an affirmative defense. The one thing should have nothing to do with the other." (Emphasis in original.) *Id.* ¶¶ 119-20.

The First District then explained that, instead of adhering to a *per se* doctrine of inadmissibility incapable of being precisely defined that was not adopted by the Illinois Rules of Evidence, Illinois courts should determine the mental-deficiency evidence to rebut *mens rea* in the same manner Illinois courts consider the admissibility of any other evidence—on a case-by-case basis, by applying the Illinois Rules of Evidence. *Id.* ¶ 138. According to the First District:

> "The reasonable critiques leveled against this mental-state evidence offered to rebut *mens rea* either fall by the wayside or are addressed in light of the Illinois

Rules of Evidence. Any concern over what our legislature intended should no longer be a question when our evidentiary rules have been codified by our state's highest court. The fear that a defendant's mental infirmity, short of insanity, could pose the risk of distracting the jury or inviting sympathy in a given case is addressed by the gatekeeping function of [Illinois Rule of Evidence 403 (eff. Jan. 1, 2011], which requires that the court consider whether the probative value of evidence is 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' [Citation.] *And of course, first and foremost, the evidence must be relevant and helpful to an understanding of mens rea, which will probably be true only in a limited number of cases*. See Ill. R. Evid. 402, 702 (eff. Jan. 1, 2011)." (Emphasis added.) *Id.* ¶ 139.

¶ 90        Our supreme court has cited *Valdez* approvingly for the following proposition: " 'Whether a doctrine is recognized as an affirmative defense is an entirely different question from whether certain evidence is admissible to disprove an element of the charged crime under the facts of a particular case.' " *Grayer*, 2023 IL 128871, ¶ 24 (quoting *Valdez*, 2022 IL App (1st) 181463, ¶ 116). However, the supreme court was considering the admissibility of evidence of voluntary intoxication in the context of a specific-intent offense. According to the supreme court:

"Attempted vehicular hijacking is a specific-intent offense. *Unlike general intent offenses, which only require that the prohibited result be reasonably expected to flow from the accused's voluntary act, specific-intent offenses require the State to prove that a defendant intended to commit the stated offense*. [Citation.] In other words, specific-intent crimes require the State to prove that defendant subjectively desired the prohibited result. [Citations.]

- 33 -

Reliance on a defendant's state of voluntary intoxication, therefore, is now a question of admissibility under the Illinois Rules of Evidence, rather than its recognition as an affirmative defense. [Citation.] Evidence is relevant if it tends to make the question of guilt more or less probable. [Citation.] Since there is a subjective component to specific-intent crimes and intoxication affects an individual's subjective mental state, a defendant's state of voluntary intoxication may be one of many relevant circumstances for the trier of fact to consider." (Emphasis added.) *Id.* ¶¶ 23-24.

¶ 91 Once again, we note it appears defendant contends Lankton's decision to not call Dr. Finkenbine at trial was based on his misunderstanding of the law regarding the admissibility of diminished capacity evidence. However, based on the record in this case and the "strong presumption that counsel's performance falls within the wide range of reasonable professional assistance" (*Enis*, 194 Ill. 2d at 377), defendant cannot demonstrate Lankton's performance was deficient based on an inartful and vague statement.

¶ 92 In addition, it does not appear Dr. Finkenbine's expert testimony regarding defendant's diminished capacity at the time of the collision would be admissible. Defendant was not charged with a specific-intent crime. The State did not need to show defendant intended to kill someone. Dr. Finkenbine's testimony focused on how defendant's thoughts and decision-making processes might have been affected by her mental health. However, the disputed issue in this case was whether defendant knew that swerving her car into oncoming traffic while driving approximately 90 miles per hour in an attempt to commit suicide created a strong probability of death or great bodily harm to another person. This is matter that could be deemed common knowledge and not a subject that is difficult to understand and explain. See *People v. Becker*, 239

- 34 -

Ill. 2d 215, 235 (2010) ("Expert testimony is not admissible on matters of common knowledge unless the subject is difficult to understand and explain.").

¶ 93    Moreover, defendant testified she knew driving her vehicle into an oncoming car could kill her. While defendant claimed she did not consider and was not thinking about what would happen to the person in the other car she swerved to hit, she acknowledged that prior to the accident, she would have known the collision could kill someone other than herself.

¶ 94                                                    2. *Jury Question*

¶ 95    Defendant next argues Lankton was ineffective because he failed to request the jury be given IPI Criminal No. 5.01B, which provides a definition for the term "knowledge," after the jury sent the following question to the trial court:

> "To sustain the charge of first degree murder under the second proposition, at what point does the defendant need to know that her act created a strong probability of death or great bodily harm to Joy Hattan? Example one, at any point in her adult life? Two, moments before she swerved her vehicle?"

Defendant asserts this was important because the crux of her defense was "whether she knew swerving into oncoming traffic would cause the other driver's death."

¶ 96    According to defendant, IPI Criminal No. 5.01B would have provided the jury with information regarding when a defendant has knowledge of something. Defendant states in her brief:

> "[A]lthough the instruction for first degree murder does not use the word 'thinking,' the definition of 'knowing' explains that the defendant must be consciously aware, suggesting that at the time of the offense, the knowledge must be present in the defendant's mind. See IPI [Criminal No.] 5.01B ('Knowledge of a material fact

- 35 -

includes awareness of the substantial probability that the fact exists.'").''

Defendant contends the jury was asking what would constitute knowledge for defendant. Therefore, according to defendant, Lankton was ineffective because he did not ask the trial court to provide the jury with IPI Criminal No. 5.01B and instead agreed with the State that the instructions already provided to the jury answered the jury's question.

¶ 97　　　　Citing *People v. Lovelace*, 251 Ill. App. 3d 607, 619 (1993), defendant additionally asserts the court had a duty to provide additional instructions to the jury because the original instructions were incomplete, the jurors were manifestly confused, and the jury requested clarification of the instructions with its question. Therefore, defense counsel was ineffective for not asking the trial court to provide the jury with IPI Criminal No. 5.01B. According to defendant:

> "The jury clearly understood that, based on [defendant's] testimony, she was not
> considering the consequences of her actions in the moments before she swerved
> and crashed Hattan's car. The definition of knowledge in IPI [Criminal No.] 5.01B
> would have clarified the jury's question and there is a probability that they would
> have acquitted [defendant] had they been properly instructed."

Defendant contends the jury's verdict is unreliable and her trial was fundamentally unfair because the jury was not given IPI Criminal No. 5.01B.

¶ 98　　　　"Generally, a trial court must provide instruction when the jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *People v. Averett*, 237 Ill. 2d 1, 24 (2010). However, according to the State, "[t]he question asked by the jury here did not ask the court to define knowing nor did it manifest confusion or doubt regarding the meaning of knowing." Instead, the jury's question focused on the point in time defendant had to know her actions created a strong probability of death or great bodily

harm. Further, the jury's question was answered by the instructions the jury had already received. According to the State, defendant's trial counsel's performance "was not deficient for failing to request IPI [Criminal No.] 5.01B where the jury did not ask for the definition of 'knowingly.' "

¶ 99 As stated above, to establish ineffective assistance of counsel, a defendant must show both her counsel's performance was deficient and she was prejudiced by the deficiency. *Strickland*, 466 U.S. at 687. The jury already had the following instruction that answered the question it asked:

> "To sustain the charge of first degree murder, the State must prove the following propositions:
>
> *First Proposition*: That the defendant performed the acts which caused the death of Joy Hattan; and
>
> *Second Proposition*: *That when the defendant did so, she knew* her acts created a strong probability of death or great bodily harm to Joy Hattan." (Emphasis added.)

The jury's inquiry appeared to be temporal in nature and did not suggest they were seeking a definition of "knew." As a result, we cannot conclude Lankton was ineffective for failing to request the court give the jury IPI Criminal No. 5.01B.

¶ 100 B. Evidentiary Ruling Regarding Defendant's Prior Rape

¶ 101 We next turn to defendant's assertion the trial court erred when it prevented her "from testifying about the reasons behind her mental health condition and her desire to commit suicide because this information was relevant to explain her mental state at the time of the crash." This statement overcomplicates defendant's actual argument, which is that the court erred by not

allowing her to introduce evidence she had been raped approximately two years before the collision at issue in this case.

¶ 102   We note defendant was allowed to testify about the heated conversation with her mother that occurred on the day of the collision. Defendant testified she had learned a few days before the heated conversation that the girl she was dating was only 16. Defendant stated the conversation was about that situation. Because defendant was 19, her mother expressed concern defendant could potentially be a sex offender. Defendant testified that was "a trigger for [her]." The conversation ended with defendant's mother asking if defendant wanted to be a sex offender. Thus, defendant was permitted to provide some evidence about the reason for her mental state at the time of the crash, albeit not to the extent counsel requested.

¶ 103   Turning back to defendant's actual claim, she argues the trial court erred by not allowing her to introduce evidence she had been raped. At defendant's trial, defense counsel asked defendant whether she had any trauma prior to the collision. The State objected to the relevance of defendant's prior trauma with regard to the incident at issue in this case and to the broad nature of the question. Outside the presence of the jury, the parties and the court discussed the evidentiary issue.

¶ 104   Defense counsel indicated he wanted to introduce evidence of defendant's prior trauma to establish her mindset on the day in question. Counsel told the trial court defendant had been raped approximately two years before the collision. Then, in the days leading up to the collision, defendant learned a person she was dating was only 16 years old. On the day of the crash, defendant and her mother had a serious argument about defendant's relationship with the 16-year-old female. Defendant's mother told defendant she could be accused of statutory rape. Defense counsel argued defendant was upset about the possibility of being accused of rape because of her

own prior rape.

¶ 105    The State maintained its objection to defendant testifying about being the victim of a rape two years earlier and also made a hearsay objection to the statements between defendant and her mother.

¶ 106    The trial court then ruled as follows:

"Okay. I do not see a problem with the defendant testifying as to her mental state at the time of the incident, or leading up to the time of the incident. I also do not see a problem for the defendant testifying as to why she was upset, that being, she had just found out that her current boyfriend [*sic*] was underage, and told her mother about it, and an argument ensued between the two. However, I do not see the probative value of a rape that occurred two years ago, and by your own proffer, was not really the impetus of her being upset. It was more that her boyfriend [*sic*] was underage and she didn't know about it, and she got into an argument with her mother. So I will allow you to establish her mental state. But as far as that, getting into her being raped two years ago, I do not find that to have probative value to the issue at hand and will not allow that testimony to be presented."

¶ 107    On appeal, defendant argues the trial court committed reversible error by preventing her from testifying about the reasons behind her mental health condition and her desire to commit suicide. Defendant contends this evidence was relevant to explain her mental state at the time of the collision. According to defendant's brief:

"Without information about the rape and [defendant's] mental health issues after that incident, it was difficult for the jury to understand why the argument with her mother could have made [defendant] more than simply 'emotional'—as the State

- 39 -

put it—and led her to an almost irrational mental state. The context of her panic attack and suicide attempt was broader tha[n] the argument she had that night with her mother and relevant to her *mens rea*."

¶ 108 Defendant acknowledges she failed to preserve this issue for appellate review. However, she asks this court to review the issue pursuant to the plain error doctrine. According to defendant, we can review this under the first prong of the plain error doctrine because the evidence at trial was closely balanced. Defendant asserts that whether she "had the requisite *mens rea* for first degree murder was a contested issue at trial."

¶ 109 The plain error doctrine allows a reviewing court to review an otherwise unpreserved error. *People v. Sebby*, 2017 IL 119445, ¶ 48. Our supreme court has noted two instances when it is appropriate to review a forfeited error:

"(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.*

In determining whether the plain error doctrine can be used to excuse forfeiture, a court first considers whether a clear or obvious error occurred. *Id.* ¶ 49.

¶ 110 Generally, we will not disturb a trial court's evidentiary ruling unless the court abused its discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 111        Based on the facts in this case, we cannot conclude the trial court's decision not to allow defendant to testify she was raped approximately two years prior to the day in question was arbitrary or unreasonable. Accordingly, we cannot conclude the court's decision constitutes an abuse of the trial court's discretion, let alone a clear or obvious error. Consequently, as a result of our determination that there was no clear or obvious error, defendant cannot establish Lankton was constitutionally ineffective for failing to preserve this issue for review because defendant suffered no prejudice from Lankton's alleged failure.

¶ 112                                C. Cumulative Error

¶ 113        Defendant also maintains she was denied a fair trial because of the cumulative effect of certain errors in this case. The alleged errors she references are: "the failure to call Dr. Finkenbine to testify at trial, failure to instruct the jury with the definition of knowledge in IPI [Criminal No.] 5.01B, and the court's failure to allow [defendant] to testify as to her mental health condition prior to the crash." Based on our resolution of each of the arguments presented, we cannot conclude any errors occurred. Accordingly, we need not consider defendant's cumulative error argument further.

¶ 114                          D. Sufficiency of the Evidence

¶ 115        We next address defendant's argument the State failed to present sufficient evidence to convict her of first degree murder. According to defendant, the State did not prove her guilt beyond a reasonable doubt because the evidence showed her mental state did not allow her to consider the harm she could do to the driver of the other vehicle she crashed into.

¶ 116        Defendant states in her appellant's brief:

    "[I]n the moments before the crash, she was not consciously aware of the likely consequences to others. She did not think about the other car at all. Therefore,

when [defendant] swerved into Hattan's car, she did not do so knowing that it could cause Hattan's death, an element necessary to prove first degree murder. 720 ILCS 5/9-1(a)(2) [(West 2020)].

\* \* \*

\*\*\* Because of her unstable mental state at the time of the crash and the suddenness of her extreme feelings, [defendant] was unable to actively and intentionally consider—or be consciously aware—that her suicide attempt could also kill someone else. [Citations.] According to [defendant's] testimony, which was unchallenged, she did not think about what would happen to the other car, her actions were impulsive. [Citation.] Thus, [defendant] did not have the *mens rea* necessary for a first degree murder conviction."

¶ 117　　When faced with a challenge the State did not present sufficient evidence to prove a defendant's guilt beyond a reasonable doubt, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]n applying this standard, we will neither reweigh evidence nor judge witness credibility; rather, we defer to the fact finder's credibility determinations." *People v. Acklin*, 2020 IL App (4th) 180588, ¶ 15. Further, we will not reverse a defendant's conviction for insufficient evidence " 'unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt.' " *People v. McKown*, 2021 IL App (4th) 190660, ¶ 49 (quoting *People v. Harris*, 2018 IL 121932, ¶ 26).

¶ 118　　The State charged defendant with first degree murder under section 9-1(a)(2) of the

Criminal Code of 2012 (720 ILCS 5/9-1(a)(2) (West 2020)), which states:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

\*\*\*

(2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another."

¶ 119 It is not disputed that defendant drove her vehicle into Hattan's vehicle without lawful justification and caused Hattan's death. As for whether defendant knew her act of driving her vehicle into Hattan's vehicle at a high rate of speed created a strong probability of death or great bodily harm to Hattan or anyone else inside Hattan's vehicle, defendant testified on cross-examination she swerved into the oncoming vehicle to kill herself.

¶ 120 Then, the State asked defendant, "You didn't know that going head-on into another vehicle could kill somebody else, you thought that it was only going to kill you?" Defendant responded, "I mean, if you had asked me that before that car accident I would have said yes. But at that moment I was thinking of nothing else."

¶ 121 Considering the standard of review in this case, a rational trier of fact could have found defendant knew driving her vehicle into an oncoming vehicle at a high rate of speed created a strong probability of death or great bodily harm both to herself and anyone in the oncoming vehicle. This is not a case where the evidence presented at defendant's trial was so unsatisfactory or improbable that a reasonable doubt remains as to the defendant's guilt.

¶ 122 E. Defendant's Sentence

¶ 123 Finally, we address defendant's argument her 30-year prison sentence was excessive and the trial court erred when it considered the harm her conduct caused to Joy Hattan

as an aggravating factor. Defendant acknowledged she forfeited the sentencing arguments because she failed to file a motion to reconsider her sentence. "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, defendant asks this court to review the issues pursuant to the first prong of the plain error doctrine.

¶ 124 For the plain error doctrine to apply, a defendant must first show a clear or obvious error occurred. *Id.* at 545. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.*

¶ 125 According to our state constitution, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A trial court has broad discretionary powers in selecting an appropriate sentence for a defendant. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 34. However, " '[t]he trial court's sentence must be based upon the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence.' " *Id.* (quoting *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102).

¶ 126 A trial court must also consider any applicable mitigating and aggravating factors from sections 5-5-3.1 and 5-5-3.2 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1, 3.2 (West 2024)) when determining an appropriate sentence. *Klein*, 2022 IL App (4th) 200599, ¶ 35. This court has stated:

> " 'The weight to be given to any *proper* factor *** is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of

discretion.' (Emphasis in original.) [*Sturgeon*, 2019 IL App (4th) 170035, ¶ 104.]
The appellate court may not substitute its judgment for that of the trial court merely because it might have weighed those factors differently. [Citation.] Further, a reviewing court presumes that a sentence imposed within the statutory range provided by the legislature is proper. [Citation.]

"A trial court's sentence is an abuse of discretion only if it is greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. [Citation.] The trial court's sentence is entitled to 'great deference because the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.' " *Id.* ¶¶ 37-38.

¶ 127    Defendant argues the trial court improperly considered Joy Hattan's death as an aggravating factor when sentencing her. After the court discussed the applicable mitigating factors in this case, it stated:

"In aggravation[,] the court *** finds that the defendant's conduct caused or threatened serious physical harm to another, that being Ms. Joy Hattan. And that a sentence is necessary to deter others from committing the same crime."

Defendant asserts Joy Hattan's death was a factor inherent in the offense of first degree murder. Therefore, when the court stated it considered in aggravation that defendant's conduct caused or threatened serious physical harm to Joy Hattan, the court relied on an improper sentencing factor.

¶ 128    In *People v. Martin*, 119 Ill. 2d 453, 455 (1988), the defendant was convicted of involuntary manslaughter. Like in the case before this court, when sentencing the defendant in *Martin*, the trial court considered, as an aggravating factor, that the defendant's conduct caused

serious harm to the victim. *Id.* Also, like in the case *sub judice*, the only other aggravating factor the trial court pointed to was deterrence. *Id.* at 457. Citing *People v. Saldivar*, 113 Ill. 2d 256 (1986), the supreme court held that considering the victim's death as an aggravating factor was plain error. *Martin*, 119 Ill. 2d at 459. Our supreme court explained:

> "In *Saldivar*[,] we held that the court erred when it considered the victim's harm as an aggravating factor in imposing sentence for voluntary manslaughter because if focused solely on the end result of this harm—the victim's death—which is implicit in that offense. Since the legislature had already taken the victim's death into account when it set the range of permissible penalties for the crime, we concluded that it would be improper to consider it once again as a justification for imposing a greater penalty." *Id.* at 459-60.

In addition, the court noted the sentencing evidence "strongly favored leniency for the defendant." *Id.* at 458.

¶ 129    Based on the evidence in this case and the trial court's full statement at sentencing, the court made a clear and obvious error by considering an improper aggravating sentencing factor. The court stated that, in aggravation, it found "that the defendant's conduct caused or threatened serious physical harm to another, that being Ms. Joy Hattan. And that a sentence is necessary to deter others from committing the same crime." The trial court also stated that "when sentencing a defendant the court is obligated to look at factors in aggravation and mitigation that may apply, and *the court then gives due weight to each one of those* in accordance with its discretion and hearing the entirety of the sentencing hearing." (Emphasis added.) Later, the court said, "[A]s a judge[,] my duty is to impose a sentence that is commensurate with the facts of this case, the evidence and aggravation and mitigation, in hopes that it has some deterrent effect on society at

large." Finally, the court stated:

> "So having regard to the nature and circumstances of the offense, and the history, character, and condition of the defendant, the court is of the opinion and it is mandated by law that you be sentenced to the Illinois Department of Corrections. The court has been given a range of 20 to 60 years. *Weighing the factors I have previously mentioned*[,] the court comes to the conclusion that a sentence of 30 years in the Illinois Department of Corrections is most appropriate." (Emphasis added.)

The court's numerous references to the factors in aggravation that it had considered, along with its own statement, "In aggravation[,] the court *** finds that the defendant's conduct caused or threatened serious physical harm to another, that being Ms. Joy Hattan," cannot be construed as a passing comment.

¶ 130     We next consider whether the evidence at the sentencing hearing was closely balanced. In this case, like the situation in *Martin*, the evidence as to how defendant should be sentenced within the applicable 20 to 60 year term of incarceration was not just closely balanced, but it could be argued to have weighed in defendant's favor.

¶ 131     At the sentencing hearing, the trial court cited Dr. Finkenbine's unrefuted testimony that defendant did not contemplate the effects of her conduct, other than her own death. According to Dr. Finkenbine, defendant (1) was having a panic attack and was distraught, (2) had misguided thoughts, (3) lacked any type of impulse control, and (4) sought relief from the panic she was suffering. The court also noted she had no prior history of criminal activity. Further, the court determined defendant was unlikely to commit another crime and the circumstances that resulted in her criminal conduct were unlikely to reoccur—with the caveat that unlikely does not mean

guaranteed. Additionally, the court stated Dr. Finkenbine's testimony established defendant was suffering from a serious mental illness. While not sufficient to establish an insanity defense, the court recognized defendant's mental illness substantially affected her ability to comprehend the nature of her acts and to conform her conduct to the law. Finally, while the court called defendant's actions selfish, it also stated it did not believe defendant had any "ill intent towards Ms. Hattan."

¶ 132　　　　Therefore, pursuant to the plain error doctrine, we excuse defendant's forfeiture of this issue. However, the State contends, even if this court finds it can excuse defendant's forfeiture based on the plain error doctrine, defendant failed to establish the trial court's reliance on the improper sentencing factor was so significant that it lead to a greater sentence.

¶ 133　　　　According to our supreme court:

> "Where the reviewing court is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing. [Citations.] However, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *People v. Bourke*, 96 Ill. 2d 327, 332 (1983).

Considering deterrence was the only other aggravating factor the trial court indicated applied in this case and the arguably limited effect a significant prison sentence for defendant could have on deterring someone in defendant's condition, we conclude it is *possible* the trial court placed significant weight on Hattan's death as an aggravating factor when sentencing defendant to 10 years above the minimum sentence allowed.

¶ 134　　　　Nevertheless, based on the record in this case, we can neither determine what weight the trial court gave to the improper aggravating factor nor determine the court's

consideration of the improper aggravating factor was insignificant. Therefore, we vacate defendant's sentence and remand for a new sentencing hearing.

¶ 135                                III. CONCLUSION

¶ 136        For the reasons stated, we affirm defendant's conviction but vacate defendant's sentence and remand for a new sentencing hearing.

¶ 137        Affirmed in part and vacated in part; cause remanded with directions.